COMMONWEALTH vs. ANTONE D. OLIVEIRA, JR.
(and a companion case[1]).

No. 92-P-1218.

Bristol. September 23, 1993. - December 22, 1993.

Present: DREBEN. KAPLAN. & GILLERMAN. JJ

*Probable Cause. Constitutional Law*, Search and seizure, Probable cause. *Search and Seizure*, Affidavit, Probable cause. *Controlled Substances. Evidence*, Judicial discretion.

A Superior Court judge erred in denying defendants' motion to suppress evidence on the basis that the "veracity" prong of the *Aguilar-Spinelli* standard was satisfied by the level of detail in the affidavit, i.e., that veracity was "self-proved," where there was no indication in the affidavit of the veracity or reliability of the unnamed informant [647-651], and where, in any event, the level of detail was insufficient to establish the informant's reliability [651].

At a criminal trial, no basis was shown for either a *Franks* hearing or an in camera preliminary hearing pursuant to *Commonwealth* v. *Amral*, 407 Mass. 511 (1990). [652]

Evidence at the trial of an indictment for trafficking in cocaine was sufficient to support a verdict of guilty and evidence with respect to the defendant's residence at a certain address was properly admitted, in the judge's discretion, with limiting instructions. [652-653]

INDICTMENTS found and returned in the Superior Court Department on January 25, 1989.

A motion to suppress evidence was heard by *Gerald F. O'Neill, Jr.*, and the cases were tried before *George C. Keady, Jr.*, J.

*Juliane Balliro* for Antone D. Oliveira, Jr.

*Francis M. O'Boy* for Suzanne M. Oliveira.

*Kevan J. Cunningham*, Assistant District Attorney, for the Commonwealth.

[1]Commonwealth *vs*. Suzanne M. Oliveira.

KAPLAN, J. After joint trial by jury in Bristol Superior Court the defendants Antone Oliveira and Suzanne Oliveira were severally found guilty of trafficking in cocaine in a weight of 200 grams or more (G. L. c. 94C, § 32E). They had applied pretrial to suppress the physical evidence, asserting that it was seized in violation of art. 14 of the Declaration of Rights of the Massachusetts Constitution because the affidavit presented to the magistrate to secure a search warrant did not disclose probable cause. The main claim in these appeals from the convictions is that the judge erred in denying a motion to suppress. There are further claims that a *Franks* motion was erroneously denied and, in respect to the defendant Suzanne Oliveira, that there was not enough evidence at trial to convict. We uphold the first claim and deny the others, with the result that the convictions will be reversed for a new trial.

1. We invite attention to the Appendix to this opinion, setting out the material section of the affidavit upon which the magistrate issued the warrant. The affiant was Charles Pelletier, an Acushnet police officer, who recounted what Kenneth Cotta of the Dartmouth police told him about statements made to Cotta by an unnamed informant. The judge summarized the highlights of the informant's statements thus:

> "Here, the informant described with particularity the defendant A. Oliveira's activities. He described speaking to A. Oliveira, who told the informant that he was going to be getting two kilos of cocaine, that he planned to keep it at 60 Middle Road, and that he was not going to keep it for long because he had customers already lined up for New Year's Eve. The informant described one of the customers. He specifically described the activities of the individual who would bring the cocaine up from Florida, and he described the activities of guards. In addition, he detailed the defendant's alleged plan to cut the cocaine up and get rid of it as quickly as possible. The informant also described seeing cocaine inside 60 Middle Road on the second floor and in the finished

cellar. He also described the existence of an apartment over the garage which served as a 'watchtower.' "

Implicitly the judge found that the Pelletier affidavit satisfied the "basis of knowledge" test of the *Aguilar-Spinelli* standard,[2] and we agree, since the informant averred direct contact with Antone Oliveira.

The judge found, and we agree, that the affidavit did not satisfy the "veracity" test (credibility of the unnamed informant or reliability of the information provided) in any customary way. Thus the Pelletier affidavit says that the unnamed informant assisted in one arrest, but arrest is not the equivalent of conviction, see *Commonwealth* v. *Rojas,* 403 Mass. 483, 486 (1988). According to the affidavit, Antone Oliveira had been arrested for drug offenses, but apart from the fact that arrests were mentioned, not convictions, the arrests were too remote in time (1970 and 1976) to count as corroboration in any calculus of the informant's veracity. See *Commonwealth* v. *Allen,* 406 Mass. 575, 579 (1990). The suggestion in the affidavit that enforcement agencies suspected Antone Oliveira of keeping weapons did not add much (and note that keeping weapons is not necessarily a crime, for possession may be licensed).

As the "veracity test" concededly came up negative on any usual basis, the judge was reduced to saying that "veracity" was "self-proved" in this affidavit, that is to say, the affidavit, in his view, was so detailed that it satisfied both the basis of knowledge and the veracity requirements. There is much difficulty in following the judge.

---

[2]The standard is summarized in *Commonwealth* v. *Upton,* 390 Mass. 562, 566 (1983) (*Upton I*), as follows: "The 'two-pronged test' required that the magistrate be informed of (1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was 'credible' or his information 'reliable' (the veracity test). *Aguilar* v. *Texas,* [378 U.S. 108,] 114 [1964]. If the informant's tip does not satisfy each aspect of the *Aguilar* test, other allegations in the affidavit that corroborate the information could support a finding of probable cause. *Spinelli* v. *United States,* [393 U.S. 410,] 415 [1969]."

There are, indeed, cases where the affidavit describes the characteristics of the targeted person or the person's activities in such detail that a court may infer that the informant had direct contact with the person, see, e.g., *United States* v. *Myers*, 538 F.2d 424, 426 (D.C. Cir. 1976), cert. denied, 430 U.S. 908 (1977), thus establishing basis of knowledge. One may say that such an inference is a kind of self-proof, but this is very different from the judge's proposition here.

The judge's proposition — that the mere proliferation of detail in an affidavit may serve as adequate proof of an unidentified informant's veracity — cannot be accepted as a flat rule. If so accepted, it would open up an interesting prospect: we would see informants guilefully providing what Pooh-Bah in "The Mikado" calls "detail, intended to give artistic verisimilitude to an otherwise bald and unconvincing narrative." Moylan, J., makes the point in *Stanley* v. *State*, 19 Md. App. 507, 533 (1974): "If the informant were concocting a story out of the whole cloth, he could fabricate in fine detail as easily as with rough brush strokes. Minute detail tells us nothing about 'veracity.' " And the judge says again in *Stanley*, quoting from a law review note:[3] " 'Uncorroborated detail of any amount hardly supports an inference that the informer is trustworthy, for even a wealth of detail is easily fabricated. For this reason, detail of this sort goes only to the first test of *Aguilar*, the basis test.' " *Ibid.*[4] Taking the same position, see *United States* v. *Martin*, 615 F.2d 318, 325 n.9 (5th Cir. 1980); *Waldrop* v. *State*, 424 So. 2d 1345, 1349 (Ala. Crim. App. 1982); *People* v. *Lindner*, 24 Ill. App. 3d 995, 999 (1975); *State* v. *Smith*, 28 Wash. App. 387, 393 (1981). Professor Wayne LaFave reaches the same conclusion, and attacks convincingly a decision, *State* v. *Chapman*, 24 N.C. App. 462, 467 (1975), that suggests a contrary view. 1 LaFave, Search and Seizure § 3.3(e) at 672 (2d ed. 1987).

---

[3]Note, Probable Cause and the First-Time Informer, 43 Colo. L. Rev. 357, 362 (1972).

[4]Judge Moylan expressed the same view in his article, Hearsay and Probable Cause: An *Aguilar* and *Spinelli* Primer, 25 Mercer L. Rev. 741, 780-781 (1974).

Professor Yale Kamisar agrees in his article, *Gates*, "Probable Cause," "Good Faith," and Beyond, 69 Iowa L. Rev. 551, 557-558 (1984).

An affidavit of whatever detail as to basis of knowledge would still need some distinct indication of the reliability of the source of the information. Statements that the informant had helped the police in the past to secure criminal convictions for similar offenses, or that the police had conducted a surveillance that corroborated by actual observation material averments attributed to the informant in the affidavit, often serve as indicators of veracity. So also there are indicators of veracity in the special cases where informants put themselves at actual risk by their assertions to the police, and here we look to detail and may speak of a kind of self-proof. Take a statement in the affidavit that the informant has admitted to acting in concert with the targeted person in the commission of particular offenses like that being charged to the person — an admission against interest that involves the informant in real danger of prosecution if he or she is later found to have borne false witness. Or assume a statement in the affidavit that the informant recounted specific facts (other than innocent or innocuous) about the person that the informant at the time would have understood to be open to definite confirmation by police observation, but that, unknown to the informant, was actually not confirmable.[5]

The judge below cited, in support of his flat proposition about detail in the affidavit, the cases of *Commonwealth* v. *Atchue*, 393 Mass. 343, 348 (1984), and *Commonwealth* v. *Rojas*, 403 Mass. at 487. These opinions envisage the possibility of a self-proving affidavit in which basis-of-knowledge materials might do double duty as indicators of informants' veracity or reliability. But that general idea did not control decision in either case, and both are consistent with our discussion above. In *Atchue* the informant was named in the

[5]Suppose the affidavit states that the informant reported the targeted person as saying that he sold drugs with special packaging to a man named Smith who was arrested by the police while carrying them. Unknown to the informant, Smith's drugs and evidence of the packaging are gone.

affidavit, a conventional corroborative element. Nor was the idea applied in *Rojas*; it was not reached because there was insufficient detail or specificity to begin with. The court said: "For an informant's tip to be considered reliable, despite failing to satisfy the requirements of the veracity prong, it must contain a high degree of specificity. In this case, the informant did not provide particularized distinguishing characteristics of the defendant's apartment, possessions, or activities." And the court then added significantly: "We note that, in recent cases endorsing the notion of the self-verifying tip, other indicia of reliability were present to support a finding of veracity. See *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985) (police investigation corroborated informant's tip); *Commonwealth* v. *Atchue, supra* (fact informant was identified carried indicia of reliability)." 403 Mass. at 487 (footnote omitted). We may add that in *Commonwealth* v. *Parapar*, 404 Mass. 319, 322-324 (1989), there was corroboration by police work and other means.[6]

Declining endorsement of the judge's proposition, taken broadly, obviates the task of formulating and enforcing a standard of specificity apposite to the problem, discourages fabrication or exaggeration on the part of informants and affiants, and encourages a due amount of police work in appropriate cases to confirm or disprove informants' allegations.[7]

---

[6]In the present case Antone Oliveira, citing *Rojas*, applied to the Supreme Judicial Court for interlocutory appeal of the order refusing suppression. The single justice denied the application, stating, "[t]he question whether [*Rojas*] governs, and therefore, the evidence must be suppressed is an issue better left open for argument on a stay of sentence in the event of conviction." After the convictions, a single justice of our court denied Antone Oliveira a stay but allowed it to Suzanne Oliveira (on condition of bail).

[7]*Effect of following the Gates case.* In *United States* v. *Caggiano*, 899 F.2d 99, 103 (1st Cir. 1990), the court, in response to *Illinois* v. *Gates*, 462 U.S. 213 (1983), said that detail could be used as a factor in assessing the reliability of informants. "We agree," said the court, "that the reliability information in both affidavits is more conclusory than specific. But we are no longer dealing with the two-pronged test of *Aguilar* and *Spinelli*; under *Gates*, we must look at the totality of the circumstances. The reliability of the informants was enhanced by the specificity and details given Officer Washek of what they saw and heard while they were in defendant's

As a separate ground of decision in the present case, we say that if, contrary to our submission above, no corroborative indicia are required, then very considerable specificity should be demanded as to basis of knowledge. The judge's finding herein about detail and specificity did not, we suppose, take account of the severe problems with self-proof simpliciter mentioned above; anyway the finding is not binding on us because the Pelletier affidavit is before us for scrutiny just as it was before the judge, and a constitutional question is at bar. We think the affidavit is largely routine as to basis of knowledge, and its detail and specificity are at a level no better than, or at all events no more than minimally better than, that attained in the *Rojas* affidavit and held insufficient there to establish the reliability of the informant.[8]

---

apartment." See also *United States* v. *Taylor*, 985 F.2d 3, 5-6 (1st Cir. 1993).

It was because the *Gates* standard was thought "unacceptably shapeless and permissive" (*Upton I*, 390 Mass. at 574), that the Supreme Judicial Court explored art. 14 of our Declaration of Rights; and this led in *Upton II*, 394 Mass. 363, 369-377 (1985), to the retention of the *Aguilar-Spinelli* standard with its clear distinction between basis of knowledge and veracity. This choice should repel us from *Caggiano*, which is a consequence of *Gates*.

[8]The affidavit in the *Rojas* case (retrieved by us in full text), sworn by a State police officer, was in substance as follows. (See 403 Mass. at 484-485.) On March 12, 1986, the affiant had a conversation with a confidential informant who had previously assisted in the arrest of one Peters for a drug violation. The informant said that Marcos Rojas, of a stated address in Lynn, deals sizeable quantities of cocaine from his first-floor apartment and distributes it to clients by the use of a pager or beeper; the clients call and Rojas makes contact and delivers. The informant has seen Rojas make deliveries in a white Toyota, Massachusetts plate 553-KOZ. The informant has seen Rojas in possession of a .357 Magnum pistol which he carries during drug transactions. Fearful of police detection, Rojas has a police scanner which he constantly monitors. The informant has personal knowledge that Rojas has a history of past violent crimes (without naming them). On March 13, 1986, the affiant talked with a concerned citizen (wishing to remain anonymous for fear of personal safety) who repeats that Rojas deals cocaine from the first-floor apartment at the stated address, utilizes a page call system, and "constantly" has a handgun. The citizen was in the first-floor apartment during the week and saw there plastic bags with cocaine.

On March 17, 1986, the affiant had another conversation with the informant. In the previous twenty-four hours the informant was in the apart-

2. A *Franks* hearing (*Franks* v. *Delaware*, 438 U.S. 154, 155-156 [1978]) is required where the defendant makes a "substantial preliminary showing" that a false statement, essential to the finding of probable cause, was included in the warrant application knowingly, intentionally, or with reckless disregard of the truth. Under *Commonwealth* v. *Amral*, 407 Mass. 511, 521-522 (1990), an in camera "preliminary hearing (prior to a *Franks* hearing)" should be held once a defendant "asserts facts which cast a reasonable doubt on the veracity of material representations made by the affiant concerning a confidential informant." No *Franks* or *Amral* showing was made here, and the judge did not err in refusing relief.

3. Suzanne Oliveira argues that she was not shown to be criminally connected to the drugs and drug paraphernalia seized when the warrant was executed at 60 Middle Road on December 30, 1988, and so her motion for a finding of not guilty should have been allowed. Especially when viewed in the light most favorable to the Commonwealth, see *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989), the evidence against this defendant appears weighty enough to support the guilty verdict. Various documents at 60 Middle Road indicated that she lived there. The police testified she said (she now denies it) that she slept in the master bedroom with Antone Oliveira. It was under the waterbed in that room that the police found 171 grams of cocaine with drug paraphernalia and $458 in currency. Cocaine was found also in numerous locations throughout the house.

Regarding the evidence tying Suzanne Oliveira to 60 Middle Road, she objected to the admission of her money order for $1,440 to the order of Irene Puig in Florida (Irene Puig, however, was present in the residence in 60 Middle Road when the warrant was executed). The judge warned against indulging any inference beyond that regarding residency (the defense argued possible prejudice arising from an implication

ment, saw Rojas in possession of several plastic bags of cocaine, carrying a .357 Magnum pistol, and responding to the pager. Rojas then left in the white Toyota to make a delivery.

that the money order signified a drug purchase transaction). The proof, so confined, was cumulative of other evidence of residency, but the judge's discretion as to how much cumulation to allow was not overstepped. See *Commonwealth* v. *Bys*, 370 Mass. 350, 360-361 (1976).

The judgments are reversed and the verdicts are set aside. The order denying the defendants' motion to suppress is vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

"I Charles Pelletier have been a Police Officer for the Town of Acushnet for approximately six years. I am currently assigned to the detective division and have been since 1985. I have been involved in numerous narcotics investigations which have resulted in the arrest and conviction for several of controlled substance violators.

"I have also attended several schools and seminars relating to narcotics investigations sponsored by the Mass. Criminal Training Council and the Bristol District Attorney's Office.

"On December 30, 1988, I received information from Detective Kenneth Cotta who is a Dartmouth Police Officer and who is currently assigned to the Bristol District Drug Task Force. I have known Detective Cotta for approximately four years and have worked with him on several occasions on narcotics investigations.

"Detective Cotta stated to me that a confidential reliable informant who has proven to be reliable in the past and has provided information which resulted in the arrest of Michael J. Whelan a controlled substance violator, poss. of cocaine with the intent to dist. told Detective Cotta where a large amount of cocaine was being stored and the person who was storing it.

"Detective Cotta stated that within in the last forty-eight hours the informant stated that the informant spoke to a male known to the informant as Danny Oliveira. The informant stated that Danny Oliveira told the informant that he was going to be getting two kilos of cocaine and that he planned to keep it at his house located at 60 Middle Road in Acushnet but that he was not going to keep it long because he had customers already lined up for it for New Years.

"The informant stated that he has seen Danny Oliveira with cocaine in the past and that two kilos was not an unusual amount for him to handle.

"The informant stated that Danny Oliveira told the informant that a Hispanic male, first name George, was bringing the cocaine up from Florida and that the Hispanic male was bringing his whole family including a wife and children, so not to attract attention to himself by the police. This informant also said 'George' drove to Massachusetts from Florida in a rental car, and as of this date George and his family were still staying inside 60 Middle Rd. Acushnet.

"Detective Cotta further stated that he received additional information from the informant stating that the informant, since their last conversation had been at 60 Middle Road Acushnet.

"The informant stated that the informant saw the two kilos of cocaine when it was at 60 Middle Road. The informant stated that Danny Oliveira showed the informant the two kilos of cocaine while the informant was in the house at 60 Middle Road Acushnet and that Danny Oliveira had several people in the house unknown to the informant.

"The informant stated that two of the persons unknown to the informant were carrying guns, possibly automatic weapons. The informant asked what the guns were for and was told by Danny Oliveira it was for protection against any uninvited guest.

"The informant further stated that Danny Oliveira stated that they were going to cut the cocaine up and get rid of it as quickly as possible and that the sales were going to be in quarter pound weights. According to this informant, all of the cocaine would be distributed before the end of the day. The informant said some of the cocaine was on the second floor and some of it was in the finished cellar. This informant also told me the apartment which is located directly over the garage is being used as a 'watchtower' and there are people inside this room watching for the police in case of a raid.

"The informant further told me a male named Bob Mulroy is down from Vermont for the purpose of picking up his share of the cocaine from Oliveira. The informant described Mulroy as a fat individual approximately 250 pounds who walks with crutches.

"After speaking with Detective Cotta I checked the previous record of Danny Oliveira who I know from previous investigations is Antone D. Oliveira. A check with the Fall River records division revealed an arrest in 1970 for poss. of narcotics, and in 1976 for poss. class D with intent to dist."