## Commonwealth *vs.* Alfonso A., a juvenile.

Suffolk. October 8, 2002. - January 6, 2003.

Present: Marshall, C.J., Greaney, Spina, Cowin, Sosman, & Cordy, JJ.

*Search and Seizure,* Affidavit, Warrant. *Constitutional Law,* Waiver of constitutional rights, Parent and child. *Waiver.*

A Superior Court judge properly denied a motion to suppress physical evidence seized from a juvenile by the police during the execution of a search warrant, where the affidavit on which the warrant was based relied on the report of a person whose identity and whereabouts were both known; where there was no suggestion that the crime to which the informant heard the juvenile admit involved events that had occurred in a public place or had attracted any kind of notoriety; and where, read in a commonsense fashion, the similarity between the crime and the confession overheard by the informant provided an adequate basis to treat the informant's report as reliable. [373-379]

The record of a hearing on a fifteen year old juvenile's motion to suppress his statements to police did not demonstrate that the police provided the juvenile with a genuine opportunity to consult with an interested adult prior to waiving his constitutional rights; further, while the fact that the juvenile had asserted his rights was important, and could, in combination with other evidence adduced at the hearing, support a finding of a requisite intelligence, experience, knowledge, or sophistication on the part of the juvenile, this court chose to remand the matter to the motion judge for findings with respect to whether this juvenile had sufficient intelligence, experience, knowledge, or sophistication to make a knowing and intelligent waiver of his rights without being given an opportunity to consult with an interested adult. [379-386]

Complaints received and sworn to in the juvenile session of the West Roxbury Division of the District Court Department on April 1, 1999.

A pretrial motion to suppress evidence was heard by *Paul D. Lewis,* J., and, on transfer to the Boston Juvenile Court, a second pretrial motion to suppress evidence was heard by *Leslie E. Harris,* J., and the cases were heard by *Stephen M. Limon,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Alex G. Philipson*, Assistant District Attorney, for the Commonwealth.

*Kenneth J. King* for the juvenile.

SOSMAN, J. The juvenile was adjudicated a delinquent on a complaint charging possession of a firearm.[1] On appeal, the juvenile claimed that his motion to suppress physical evidence and his motion to suppress statements were erroneously denied. The Appeals Court reversed, opining that both motions to suppress should have been allowed. *Commonwealth* v. *Alfonso A.*, 53 Mass. App. Ct. 279, 295 (2001). We granted the Commonwealth's application for further appellate review. For the following reasons, we conclude that the motion to suppress physical evidence was properly denied, and that further findings are required with respect to the motion to suppress the juvenile's statements. We therefore remand the matter for further proceedings.

1. *Motion to suppress physical evidence.* On January 28, 1999, the police executed a search warrant at 21 Montvale Avenue in the Roslindale section of Boston, seizing three twelve-gauge shotguns, two twenty-gauge shotguns, and a pellet gun. The warrant was based on the affidavit of an experienced Boston police detective. The affidavit recited the following facts.

Within the two hours preceding the preparation of the affidavit, the detective had received information from a source whose whereabouts and identity were known to the detective but who wished to remain anonymous. The informant stated that he had "observed six rifles, three shotguns, two rifles, and one air pellet rifle" at the 21 Montvale Street address. There were two persons then at the house. The informant knew their first names ("Ricky" and the juvenile, whom we refer to by the pseudonym "Alfonso"), but no last names. He reported that "Ricky" lived in the house with his parents, but did not think that the parents were presently in the house. "Alfonso" had stated "that he took the guns in a Breaking & Entering on the

---

[1] He was also adjudicated a delinquent by reason of breaking and entering in the day time and larceny over $250. Those complaints were placed on file with the juvenile's consent. On a complaint charging the juvenile with unlawful possession of ammunition, the juvenile was found not delinquent.

27th of January, 1999, in West Roxbury." In fact, the detective knew that there had been a break-in at 24 Chestnut Street in the West Roxbury section of Boston, on that date (which was the day prior to the informant's report), in which three twelve-gauge shotguns, two twenty-gauge shotguns, and a pellet gun had been taken. The informant reported that "Ricky" was going to put the guns in a black bag and store them in the garage. Meanwhile, "Alfonso" was making phone calls to find a buyer for the weapons. "Alfonso's" asking price was $300 to $400 a weapon. According to the informant, "Alfonso" had scheduled a meeting later that night with two individuals for a possible sale of the weapons. Based on that information, the detective sought and obtained a warrant to search the premises for "6 rifles, black bag, drugs and drug paraphernalia."[2]

The juvenile contends that the information from the informant failed to satisfy either prong of the "two pronged test" of *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-376 (1985). Like the Appeals Court, we readily conclude that the affidavit satisfied the "basis of knowledge" prong of the *Aguilar-Spinelli* test. *Commonwealth* v. *Alfonso A.*, *supra* at 281-282. In context, it is apparent that the informant was reporting his own observation of the guns in question (describing the specific types and number of weapons he had seen, and the nature, color, and location of the container in which they were being placed) and his own overhearing of both the juvenile's admission as to how he had obtained the guns (including the date and location of the break-in) and the juvenile's telephone calls seeking to arrange sales of the guns (including such details as prices and the approximate time of a planned meeting with some potential purchasers). The affidavit expressly states that the informant "observed" the guns, and the level of detail provided is consistent with personal observation, not mere recitation of a casual rumor. See *Commonwealth* v. *Welch*, 420 Mass. 646, 651-652 (1995) (level of detail permits

---

[2]Nothing in the search warrant affidavit identified any basis for believing that drugs or drug paraphernalia would be present at the location to be searched, and no drugs or drug paraphernalia were found during the search. The only items seized were the weapons, various types of ammunition, a black bag, and a backpack.

inference that informant "had direct knowledge"); *Commonwealth* v. *Robinson*, 403 Mass. 163, 165 (1988), quoting *Spinelli* v. *United States, supra* at 416 ("it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation").

With regard to his conclusion that the veracity prong of the *Aguilar-Spinelli* test had been satisfied, the motion judge relied on the extent of detail in the informant's information, police corroboration of a portion of that detail, and police knowledge of the identity and whereabouts of the informant. In combination, those factors provided sufficient reason to treat the informant's information as reliable. While we must, of necessity, parse each of the items proffered as evidence of the informant's reliability, we must simultaneously bear in mind that the *Aguilar-Spinelli* test is not to be applied "hypertechnically." *Commonwealth* v. *Upton, supra* at 374. Rather, we consider whether, taken as a whole and read in a commonsense fashion, the affidavit adequately demonstrates that the informant has provided reliable information. See *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985), quoting *United States* v. *Ventresca*, 380 U.S. 102, 108-109 (1965) (search warrant affidavit should be interpreted "in a commonsense and realistic fashion").

The informant here was not anonymous. The police knew his "identity" and his "whereabouts." Although the informant was not named in the affidavit,[3] he was not an untraceable, unknown source. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 103-104 (1997) (informant "reachable by authorities"); *Commonwealth* v. *Welch*, 420 Mass. 646, 651 (1995) (police "would be able to contact" informant); *Commonwealth* v. *Bakoian*, 412 Mass. 295, 301 (1992), quoting *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984) ("identification of the instant informant

---

[3] "The strict requirements of reliability which govern an analysis of an anonymous informant's trustworthiness are relaxed with respect to named and identified sources." *Commonwealth* v. *Freiberg*, 405 Mass. 282, 297, cert. denied, 493 U.S. 940 (1989).

to the police strengthened his or her credibility and 'carrie[d] with it indicia of reliability of the informant' "); *Commonwealth v. Cast*, 407 Mass. 891, 898-899 (1990) (informant met with Federal agents and gave telephone number at which he was later reached); *Commonwealth v. Love*, 56 Mass. App. Ct. 229, 232-234 (2002), and cases cited.[4] Although police knowledge of the informant's "identity" and "whereabouts" would not be adequate standing alone to confirm the informant's reliability, it is a factor that weighs in favor of reliability.

The information provided was detailed. As discussed above, the details provided by the informant pertained to many aspects of what he had heard and seen. As to the contraband itself, the informant gave details of the number and type of guns seen, the nature of the container in which they were being placed, and the precise location where they were being stored. He identified, albeit by first name only, the two persons there, indicating that it was the home of one of them. He provided detail of how and when the guns had been obtained, i.e., by way of a break-in in West Roxbury the day before. He identified that one of the named occupants of the house was making telephone calls to locate a buyer for the guns; he knew the price being asked; and he knew of a planned meeting that night with two potential buyers. See *Commonwealth v. Va Meng Joe, supra* at 103, and cases cited. While we agree with the Appeals Court that detail, by itself, does not ordinarily suffice to establish reliability, *Commonwealth v. Alfonso A., supra* at 284, citing *Commonwealth v. Oliveira*, 35 Mass. App. Ct. 645, 648 (1993),[5] it remains a factor in the over-all assessment of the informant's reliability. See

---

[4]The Appeals Court faulted the affidavit as "vague" on this issue, lacking "any indication that [the detective] knew the name of the informant [or] that he could readily reach him or her." *Commonwealth v. Alfonso A.*, 53 Mass. App. Ct. 279, 287 (2001). That the affidavit did not spell out precisely how the detective knew the informant's "identity" and "whereabouts" does not detract from the unmistakable import of the detective's sworn statement, i.e., that the detective felt confident that he could indeed identify and locate the informant.

[5]"The judge's proposition — that the mere proliferation of detail in an affidavit may serve as adequate proof of an unidentified informant's veracity — cannot be accepted as a flat rule. If so accepted, it would open up an interesting prospect: we would see informants guilefully providing what Pooh-Bah in 'The Mikado' calls 'detail, intended to give artistic verisimilitude to an otherwise bald and unconvincing narrative.' . . . 'If the informant were

*Commonwealth* v. *Aarhus*, 387 Mass. 735, 744 (1982) ("precise description of the location of the knife from an informant known to the authorities tended to demonstrate the reliability of his information").

Here, a critical component of the detail provided by the known informant was corroborated by police knowledge of the break-in the day before. While detail alone does not confirm the informant's reliability (see note 5, *supra*), police corroboration of that detail is a strong indicator of reliability. See *Commonwealth* v. *Alfonso A.*, *supra* at 284-286, and cases cited. The informant's description of the weapons, and the reported admission by the juvenile that they had been taken during a break-in the previous day at a location in West Roxbury, matched the weapons that the police knew had been taken during a break-in at 24 Chestnut Street, West Roxbury, on that date.

The juvenile argues that the number of weapons did not match, interpreting the affidavit as describing twelve guns possessed by "Ricky" and "Alfonso," as compared with the six guns taken in the West Roxbury incident known to the police. The juvenile misinterprets the plain meaning of the affidavit. The affidavit refers to the informant observing "six rifles," which are then more precisely described as "three shotguns, two rifles, and one air pellet rifle." If, as the juvenile contends, the "six rifles" are in addition to the "three shotguns, two rifles, and one air pellet rifle," there would not be any separate reference to both "six rifles" and "two rifles" — that category of weapons would have been described simply as "eight rifles." Without needing to dissect the grammar and punctuation of the affidavit, the application itself, in support of which the affidavit was submitted, unambiguously requested issuance of a warrant to search for "6 rifles," not twelve rifles. The number of weapons seen by the informant matched the number of weapons taken in the previous day's break-in.

The types of weapons were also consistent. Although the victim of the break-in had reported the stolen weapons as three

concocting a story out of whole cloth, he could fabricate in fine detail as easily as with rough brush strokes.' " *Commonwealth* v. *Oliveira*, 35 Mass. App. Ct. 645, 648 (1993), quoting *Stanley* v. *State*, 19 Md. App. 507, 533 (1974). See *Commonwealth* v. *Rojas*, 403 Mass. 483, 487 (1988).

twelve-gauge shotguns, two twenty-gauge shotguns, and one pellet gun, the informant's characterization of the two twenty-gauge shotguns as "rifles," while characterizing the three twelve-gauge shotguns as "shotguns," is not a discrepancy of any significance. The critical feature is not the technical differences between "rifles" and "shotguns," but the fact that the informant saw three "shotguns" of one type, two "rifles" of another type, plus one "air pellet rifle." That description is a reasonably accurate account of the number and types of weapons taken in the previous day's break-in. Of course, the date of the break-in, and the location of the break-in, were also accurate.

The Appeals Court likened this case to that of *Commonwealth v. Upton*, 390 Mass. 562, 572-573 (1983), rev'd, 466 U.S. 727 (1984), *S.C.*, 394 Mass. 363, 374 (1985), where an unknown woman telephoned the police with information, part of which pertained to a police search that had recently occurred in a motel. While the anonymous and untraceable informant in that case gave a report consistent with what the police knew of that search, corroboration of something that had happened in a public place carried little significance, as anyone could have known those same details. We do not see the cases as similar. As discussed above, the present affidavit did not rely on an anonymous telephone report, but on the report of a person whose "identity" and "whereabouts" were both known. Nor is there any suggestion here that the break-in to which the informant heard the juvenile admit, which matched the break-in known to the police, involved events that had occurred in a public place. There is also no reason to believe that the break-in in West Roxbury had attracted any kind of notoriety or newsworthiness that would have made the precise details common knowledge by the very next day, nor any reason to believe that the informant was affiliated with or known to the victim of the break-in, such that he could have known the date, location, and exact items stolen through conversation with the victim. Read in a commonsense fashion, the "match" between the previous day's break-in and the confession overheard by the informant, combined with the weapons seen by the informant, provided an adequate basis to treat the informant's report as reliable.

We therefore conclude that the motion judge properly denied

the motion to suppress physical evidence seized during the execution of the search warrant.

2. *Motion to suppress statements.* The juvenile also moved to suppress statements he had made to the police. The facts found by the motion judge, as amplified by uncontested evidence presented at the hearing, are as follows.

In anticipation of the search warrant, four or five police officers went to 21 Montvale Street and secured the second-floor residence. Present were Richard McMann (Ricky), two other young adult men, and the juvenile. The police ascertained that the two other young men had outstanding default warrants. They were arrested and removed from the scene. The juvenile and Ricky remained at the residence with the officers. As part of the preliminary inquiry and patfrisk of the juvenile, the juvenile indicated that he had been arrested two times before, including on a charge of robbery. The officers then waited at the apartment with the juvenile and Ricky for some two and one-half hours before the search warrant arrived. During that wait, Ricky's mother, stepfather, and older brother returned home to the apartment. The adults stayed in the kitchen. Ricky and the juvenile were kept seated on a couch in the living room. At one point, when the juvenile needed to use the bathroom, a detective accompanied him. It was apparent that the juvenile and Ricky were not free to leave.

When the police received word that the search warrant had been approved and was on the way, they decided to question Ricky and the juvenile. They took Ricky into a bedroom to question him separately. As they went, Ricky's mother asked whether she could be present during the interview. The police told her that, because Ricky was an adult (he was eighteen years old at the time), it was Ricky's choice whether to have anyone else present. Ricky announced that he did not want his mother to accompany him. This exchange took place in the presence of the juvenile and was presumably overheard by him.

After completing the questioning of Ricky, two detectives next took the juvenile into the bedroom. They asked him his date of birth, which was November 14, 1983, making the juvenile fifteen years old at the time. One of the detectives then read the juvenile his Miranda warnings. He asked the juvenile

whether he understood his rights, and specifically asked him if he was aware of those rights as a result of his previous arrests. The juvenile stated that he was aware of his rights. After giving the juvenile his Miranda warnings, the detective asked the juvenile if he wanted them to contact or get his mother and have her present during the interview.[6] In the alternative, the detective asked the juvenile if he wanted to consult with some other adult, indicating that Ricky's mother and two other adults were in the kitchen. The juvenile stated that he did not want his mother present and did not want to consult with any adult. The detective repeated the offer two more times. The juvenile again declined the offers, stating that he did not want anyone else present. The juvenile then waived his rights and gave a statement in which he admitted to the West Roxbury break-in the day before and confirmed the presence of the stolen guns being held at the 21 Montvale Avenue residence. He stated that he had committed the break-in along with other participants, but he refused to give the names of those other perpetrators.

For purposes of establishing a valid waiver by a juvenile under the age of fourteen years, we require the Commonwealth to show "that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights." *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983). However, where a juvenile is fourteen years of age or older, the rule is more flexible: "[T]here should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent. For a waiver to be valid without such a consultation the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." *Id.* The court later clarified that actual consultation between the juvenile and a parent, interested adult, or attorney was not required, as long as there was a "genuine opportunity" for such consultation. *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987). "It is the

---

[6]The juvenile's mother was at home at the time and was readily available. No effort had been made to contact her during the time that the officers had been holding the juvenile.

juvenile's opportunity to consult that is critical, not whether he avails himself of it." *Id.* "So long as the juvenile is at least fourteen and has the opportunity for a meaningful consultation, the juvenile may make a valid waiver without actual consultation." *Commonwealth* v. *Berry*, 410 Mass. 31, 35 (1991). "[T]he ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police. The choice of a sixteen year old juvenile not to consult with an available friendly advisor concerning those matters suggests that the juvenile's understanding was such that consultation was unnecessary." *Commonwealth* v. *MacNeill*, *supra* at 79. To date, we have not imposed specific requirements regarding the precise nature of the juvenile's "opportunity" for consultation. See *Commonwealth* v. *Philip S.*, 414 Mass. 804, 811 n.5 (1993) (officers not required to recommend that juvenile and adult discuss juvenile's rights during their opportunity to confer); *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992) (police not required expressly to advise juvenile and adult that they may confer privately).

The motion judge ruled that the repeated offers to get the juvenile's mother and have her present at the interview, and the alternative offers to have one of the other adults in the apartment be present, gave the juvenile a "meaningful opportunity to consult with an adult." We agree with the juvenile that the offers made here did not amount to the "genuine opportunity" for consultation required by our cases. *Commonwealth* v. *MacNeill*, *supra* at 78. While we have never expressly held that the adult in question must be physically present in order for there to be that "genuine opportunity" for consultation, an adult was in fact present in all of the cases where we have found that there was the required "opportunity" for consultation. See *Commonwealth* v. *McCra*, 427 Mass. 564, 565-566 (1998); *Commonwealth* v. *Hogan*, 426 Mass. 424, 430-431 (1998); *Commonwealth* v. *Philip S.*, *supra* at 811-812; *Commonwealth* v. *Ward*, *supra*; *Commonwealth* v. *Berry*, *supra* at 33; *Commonwealth* v. *Tevenal*, 401 Mass. 225, 227 (1987); *Commonwealth* v. *MacNeill*, *supra* at 75. We have also noted that, in order for there to be any genuine consultation, the adult who is

available to the juvenile must be informed of and understand the juvenile's constitutional rights. See *Commonwealth* v. *Berry,* *supra* at 34-35; *Commonwealth* v. *Guyton,* 405 Mass. 497, 502 n.1 (1989). That requirement connotes the presence of an adult, or, at the very least, contact between the adult and the police so that the police may inform the adult of those rights.

For purposes of deciding the present case, we need not rule out the possibility that something less than actual physical presence of the adult might suffice (e.g., interested adult participating through speaker telephone). Here, the repeated offers to get the juvenile's mother did not, in a practical sense, provide the juvenile with the protection that is envisioned by the requirement that the juvenile have an opportunity to consult with an adult. The "genuine opportunity" for consultation that our cases envision is not merely a theoretical opportunity, that the juvenile may utilize at some future time, but an opportunity that is immediately and evidently available to the juvenile before the juvenile waives his or her rights. The detectives had already advised the juvenile of his rights, and obtained his confirmation that he understood those rights, before mentioning anything about contacting his mother. In context, it was apparent that the detectives were ready to proceed then and there, and the juvenile would, in effect, need to assert his rights in order to interrupt the interrogation and await his mother's arrival. The very purpose of our rules pertaining to the opportunity for consultation with an adult is because "most juveniles do not understand the significance and protective function of these rights even when they are read the standard Miranda warnings," they "frequently lack the capacity to appreciate the consequences of their actions," and the opportunity for consultation with an adult "prevent[s] the warnings from becoming merely a ritualistic recitation wherein the effect of actual comprehension by the juvenile is ignored." *Commonwealth* v. *A Juvenile,* 389 Mass. 128, 131, 132 (1983). If the juvenile needs to assert his rights in order to obtain the benefit of any consultation with an adult, the purpose behind the requirement is nullified.

We also agree with the Appeals Court's observation that "a juvenile in trouble may be embarrassed to ask for an adult's help," *Commonwealth* v. *Alfonso A.,* 53 Mass. App. Ct. 279,

293 (2001), and the presentation of the ostensible "opportunity" to consult with his mother placed this juvenile in the posture of having affirmatively to ask for that help (and then wait for that help to arrive). There is too great a risk that a juvenile will engage in a show of bravado rather than admit to any desire or need to consult with an adult.[7] When the adult is present and immediately available, the juvenile may still decline to consult with that adult, but there is at least no additional pragmatic barrier to consultation that the juvenile must overcome. Here, there was such a barrier, that many juveniles would be hard pressed to overcome. The offer to get the juvenile's mother, no matter how many times it was made, did not present this juvenile with a "genuine opportunity" to consult with her.

We also agree with the Appeals Court's analysis that the offer to allow the juvenile to consult with any of the other adults present in the apartment did not provide the juvenile an opportunity to consult with an "interested adult." *Commonwealth* v. *Alfonso A.*, *supra* at 293. Our cases have not required that the adult with whom the juvenile has an opportunity to consult literally be a parent of the juvenile. See *Commonwealth* v. *McCra*, *supra* at 568-569 (aunt); *Commonwealth* v. *Hogan*, *supra* at 430-431 (grandmother); *Commonwealth* v. *MacNeill*, *supra* at 77-78 (grandfather). The adult must, however, be someone with a relationship with the juvenile who "is sufficiently interested in the juvenile's welfare to afford the juvenile appropriate protection." *Id.* See *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983) (characterizing interested adult as "someone in loco parentis").[8] Here, there was no information suggesting any close relationship between the juvenile and any of the adults then in the apartment. The juvenile knew Ricky's mother from occasional visits with her son, but Ricky's mother understand-

---

[7] That would be particularly true where, as here, the juvenile saw his older compatriot expressly decline to have his mother present.

[8] We have not required that the adult be completely free of conflicting loyalties or tensions. See *Commonwealth* v. *McCra*, 427 Mass. 564, 568-569 (1998) (fact that juvenile's aunt was sister of victim did not preclude her from acting as "interested adult"); *Commonwealth* v. *Berry*, 410 Mass. 31, 32, 35-36 (1991) (father qualified as interested adult despite prior night's violent confrontation with juvenile). If, however, the adult is "actually antagonistic" to the juvenile, the adult does not qualify as an "interested adult." See *Commonwealth* v. *Philip S.*, 414 Mass. 804, 809 (1993).

ably testified at the hearing that the juvenile was "not [her] responsibility." There was no showing that the juvenile even knew any of the other adults in the apartment. And, while those adults were more readily at hand than the juvenile's mother, the detective's offer to allow the juvenile to consult with them still left it to the juvenile affirmatively to interrupt the interrogation and request such assistance. None of those adults was present in the room, and none of them had been advised of the Miranda warnings. They were not in any position — lacking the requisite relationship with the juvenile, immediate presence, and awareness of the juvenile's rights — to provide him with guidance as to any waiver of his rights.

We thus conclude that this juvenile was not accorded any "genuine opportunity" to consult with an "interested adult" prior to waiving his constitutional rights. Where the juvenile had no such opportunity, the Commonwealth must make the alternative showing of "circumstances [demonstrating] a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983). Our ability to address this alternative is hampered by the fact that the motion judge made no findings on this issue, having decided (erroneously) that there had been an adequate opportunity to consult with an interested adult. The Appeals Court concluded that the record was insufficient to support any finding of the requisite "intelligence, experience, knowledge or sophistication," and therefore concluded, without any remand for further findings, that the motion to suppress statements should have been allowed. *Commonwealth* v. *Alfonso A.*, *supra* at 294, quoting *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983). We disagree.

The record reflects that the juvenile had been arrested twice before, including one arrest on a robbery charge and the other on an unidentified misdemeanor. While there was no specificity as to what warnings he had been given in the course of those prior encounters with the juvenile justice system, at least some familiarity with that system can be inferred,[9] and the juvenile acknowledged that he was familiar with his rights by way of

---

[9]The present case is distinguishable from *Commonwealth* v. *Guyton*, 405 Mass. 497, 503 (1989), where the juvenile's statement to the police that he

that prior involvement with the police. Of greatest importance is the fact that, during questioning, this juvenile actually asserted his right to remain silent. The juvenile admitted his involvement in the previous day's break-in, and acknowledged that the crime had been perpetrated "with other people," but he refused to tell the officers who those "other people" were. The juvenile's actual assertion of his rights is the strongest indication possible that the juvenile was indeed aware of and understood those rights and was capable, on his own, of asserting them. Thus, for example, in *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 609-610 (1984), where the juvenile was not given an opportunity to consult with an adult, the juvenile's prior involvement with the courts coupled with his assertion of his right to an attorney during a recent interrogation sufficed to support the judge's conclusion that the juvenile had sufficient experience, knowledge, or sophistication. Here, while the juvenile's prior involvement with the courts is less than that of the juvenile in *Commonwealth* v. *King, supra,* the cases have the same critical factor in common: the juvenile's proven ability to assert his rights when he wanted to do so. See *Commonwealth* v. *Pucillo*, 427 Mass. 108, 111 (1998) (finding of valid waiver supported by fact that juvenile "had successfully invoked his right to silence earlier in the evening"). See also *Commonwealth* v. *Mandile*, 397 Mass. 410, 414 (1986) (adult defendant's awareness of his right to counsel illustrated by fact that he "exercised that right prior to giving his statement").

While the fact that the juvenile asserted his rights is important, and could, in combination with other evidence adduced at the hearing, support a finding of the requisite intelligence, experience, knowledge, or sophistication, it is not for this court to make that finding. The record permits it, but it does not compel it. There is some contrary evidence (for example, the juvenile's extremely poor performance in school) that must be weighed against the evidence that would support the finding. And, of course, the motion judge had the opportunity to observe the juvenile (although the juvenile did not

understood his rights because he had "heard it before" stemmed from the fact that he had heard Miranda warnings recited on television, not from any prior involvement in the juvenile justice system.

testify at the hearing). We therefore remand the matter for the judge's findings with respect to whether this juvenile had sufficient intelligence, experience, knowledge, or sophistication to make a knowing and intelligent waiver of his rights without being given an opportunity to consult with an interested adult.

*So ordered.*