Agnes, Peter W., J.
INTRODUCTION
The defendant, Junet Antonio Corniel, is charged with trafficking in cocaine. He has filed a motion to suppress evidence consisting of seven hundred (700) grams of cocaine found in the back seat of his car. Based on the credible evidence presented at the hearing on the motion to suppress, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
Around 11p.m. on March 29, 2004, the Lawrence police arrested Miguel Rivera after he sold more than fourteen grams of cocaine to Officer Mark Rivet. Rivera agreed to cooperate with the police by providing information to them. He said that the name of his supplier, the defendant, was “J,” and that he was a chubby Hispanic male who was about five-feet, six-inches tall. He further told the police J’s street address and said that J would be traveling from his home on Graynard Terrace to South Lawrence for a drug pick-up in a maroon Dodge Stratus that night. Rivera was neither released from custody, nor did the police make any promises to Rivera in exchange for this information.
The police set up surveillance around Graynard Terrace at the alleged address of the defendant. The police observed a chubby Hispanic male, who was about 5’6" exit the house and enter a maroon Dodge Stratus. The Hispanic male did not have anything in his hands. Officer Rivet followed the car from Graynard Street to Bailey Street in South Lawrence. The defendant exited the car and entered a house. After a short period of time, the defendant exited the house with what appeared to be an opaque plastic bag. The bag was offered into evidence as exhibit 1.
The defendant started driving back towards North Lawrence, but the police stopped his vehicle. At this time, there were about four police cars with a total of four to five officers involved in the stop. As Rivet approached, the defendant rolled down his window. Rivet saw the opaque bag in the backseat of the car and he testified that he smelled a strong odor, an odor that he claimed were adulterants emanating from the bag. Officer Rivet told the defendant to get out of the *617 car. He performed a pat-down frisk. At this point, Rivet removed the bag from the car. Upon opening the bag, Rivet saw that it contained two other bags in which there appeared to be white powder which was later determined to be 700 grams of cocaine. The cocaine was packaged in a zip-lock bag, inside two other plastic bags and the outer bag was knotted. During the entirety of the stop, the defendant was polite and cooperative.
At trial, Officer Rivet identified the defendant as the man driving the car, although he was much thinner in court. He also testified, over an objection, to the following: although pure cocaine has no odor, the chemicals used by the original packagers in South America cause cocaine to give off the same odor regardless of the methods used to process it or the varying dilutants added to cut it. The odor that the cocaine gave off in court was the same odor that cocaine always gave off. He said that the odor is strong. In his fifteen years working in drug investigation, this was only Officer Rivet’s third time detecting the odor of cocaine, while standing outside a vehicle. Rivet based his opinion about the odor of cocaine from previous investigations and information obtained from State Police Trooper Masterson. However, Rivet’s ability to smell cocaine had never been tested or measured.
The Commonwealth called state Trooper Masterson to the stand as an expert on cocaine’s characteristic odor. The defense objected, but the court took Trooper Masterson’s testimony, de bene, and declared that the court would rule on the objection later. He is a nine-year veteran and was assigned to the Suffolk County Drug Task Force. Previously, he served as a member of the Essex County Drug Task Force. He received his training in narcotics investigation from federal law enforcement agencies and from other states including Massachusetts. His Curie Vitae was offered into evidence. He testified as to the following: officers in the drug task force are trained to smell the distinct odor of cocaine because in their undercover capacity they have to be able to distinguish between real and counterfeit cocaine. Masterson is trained to identify drugs by sight, smell and touch. Cocaine comes to Lawrence via Mexico from South America. Cocaine is extracted from the coca leaf by harsh chemicals such as gasoline, ether or ethanol. The leaves are crushed and mixed into a paste which is then processed and turned into powder where it is packaged and shipped to the United States. It is then diluted multiple times with a variety of substances including lidocaine, acetone, baby powder, rat poison and other white or off-white powders. These dilutants may affect cocaine’s characteristic odor but regardless of the process, the odor of cocaine is fairly constant. Larger quantities of cocaine emit stronger odors and more pure cocaine also emits stronger odors. However, he also said that pure cocaine is odorless. The odor is the result of the chemical breakdown of the coca leaf but he admitted that he had no knowledge of the specific chemical reaction that results from processing cocaine. Trooper Master-son has previously used his sense of smell to locate cocaine hidden in vehicles. The cocaine that was in evidence in this case still had the distinctive odor that he associated with cocaine. In his opinion, Officer Rivet could detect the odor of cocaine that had been in the car for only a few minutes, while standing outside the vehicle, even though it was tightly wrapped inside several plastic bags. Trooper Masterson had not conducted any experiments to confirm his view about the distinctive odor of cocaine, nor were the result of any other experiments offered into evidence.
RULINGS OF LAW
Based on the information provided by the informant, and the police investigation that corroborates that information, Officer Rivet had probable cause to arrest the defendant prior to seizing the bag. The police conducted a valid search incident to arrest; therefore, the motion to suppress is denied.
1. Probable Cause to Arrest Based on Informant’s Information
Probable cause to arrest a suspect based on information provided by an informant exists when the Commonwealth satisfies the familiar two-part test derived from Spinelli v. United States, 303 U.S. 410 (1969), and Aguilar v. Texas 378 U.S. 108 (1964). See Commonwealth v. Upton, 394 Mass. 363 (1985). The informant must have a basis of knowledge for the information that he provides, Spinelli, 303 U.S. at 410, and the informant must be reliable. Aguilar, 378 U.S. at 108.
A. Basis of Knowledge
An informant, who provides specific information derived from personal observations, establishes a basis of knowledge. Commonwealth v. Alvarez, 422 Mass. 198, 207 (1996). The informant claimed to have bought drugs from the defendant in the past which suggest that the informant observed his seller and where the drugs were being sold. Also, highly detailed information is indicative of first-hand knowledge. Commonwealth v. Welch, 420 Mass. 646, 651-52 (1995). In this case, Rivera provided very specific information: the defendant was a chubby Hispanic male who was about 5’6," he would be driving a maroon Dodge Stratus, the defendant goes by the nickname “J,” the defendant’s address, and the defendant would be making a drug deal in South Lawrence that night. The facts of this case suggest that the informant had a basis of knowledge for the information that he gave.
B. Reliability
Reliability can be shown by: (1) an informant’s declaration against penal interest, (2) self-verifying detail, (3) corroboration by the police, (4) history with the informant that proves that he was reliable, and (5) *618 a defendant’s recent conviction of a crime similar to the one which is the subject of the tip. Commonwealth v. Meija, 29 Mass.App.Ct. 665, 668 (1991); citing Commonwealth v. Atchue, 393 Mass. 343, 348 (1984); Commonwealth v. Pellier, 362 Mass. 621, 625 (1972); Commonwealth v. Germain, 396 Mass. 413, 418 n.7 (1985); Commonwealth v. Selah, 396 Mass. 406, 410 (1985); Commonwealth v. Parapar, 404 Mass. 319,323 (1989). The first three factors are the only ones that are relevant to this analysis.
i.Statement Against Penal Interest
When the Commonwealth relies on a statement against an informant’s penal interest to prove that the information is reliable, the Commonwealth must show that the police knew the informant’s identity, Commonwealth v. Allen, 406 Mass. 575, 579 (1990), and that the informant had a reasonable fear of prosecution. Commonwealth v. Melendez, 407 Mass. 53, 57 (1990). Cf. Commonwealth v. Rosenthal, 52 Mass.App.Ct. 707 (2001) (an informant, who agrees to tip the police in exchange for relief from his social security problems does not create a reasonable fear of prosecution, as opposed to an administrative sanction).
In this case, the police knew Rivera’s identity because at the time the information was provided, he was arrested and in police custody. Furthermore, Rivera made statements having a reasonable fear of prosecution. Admission of a crime carries its own indicia of reliability. Commonwealth v. Simpson, 442 Mass. 1009 (2004) (while delivering cocaine to an undercover officer, she revealed her source).[1] The police had just arrested Rivera for possessing 14 grams of cocaine. By subsequently telling the police who his supplier was, he directly inculpated himself for the crimes for which he was charged. See Parpar, 404 Mass, at 322. This is unlike Melendez, where, although the informant admitted to buying and using cocaine, the court found that there was no “threat of police retaliation for giving false information” because he relayed the information over the phone, and thus had no reasonable fear of prosecution. 407 Mass, at 57. Here, the informant was arrested, in police custody, and not dealing with the police at arms length over the phone; thus, Mr. Rivera had a reasonable fear of police retaliation for giving false information. See id.
ii.Self-verifying Detail
“When an informant provides veiy detailed and highly specific information, the probability increases that the information came from a reliable source.” Commonwealth v. Oliveira, 35 Mass.App.Ct. 645 (1993); Parapar, 404 Mass, at 323 (an informant who gave the exact location of the transaction, the defendant’s name, accurately described the defendant, and the color and make of the defendant’s car, was reliable). Similar to the facts of Parapar, Mr. Rivera described the defendant as chubby, Hispanic and male. He provided his name, and the make, model, and color of the defendant’s car as well as the address of where the defendant lived and his destination. Given these facts, the informant provided information with a high level of detail that supports a finding that the informant was reliable.
iii.Independent Corroboration
Police corroboration of the informant’s statements provides another level of reliability. Commonwealth v. Alfonso A., 438 Mass. 372, 377 (2003); Commonwealth v. Welch, 420 Mass. 646, 652 (1995). Furthermore, it can compensate for deficiencies in the Commonwealth’s demonstration that the informant was reliable. Commonwealth v. Robinson, 403 Mass. 163, 166 (1988). In this case, the officer testified that they observed a chubby, Hispanic male, about 5’6" leave the house at the address provided. The police observed him get into a maroon Dodge Stratus and drive to the neighborhood that Rivera had predicted. Lastly, the police watched as the defendant entered a building and leave only after a short period of time, cariying an opaque plastic bag.[2] The observations made at the scene were identical to the information provided by the informant, which augments the informant’s reliability. Taken together, the information gave the police probable cause to arrest the defendant.
2.Search Incident to an Arrest
When police arrest a driver of a car, they may contemporaneously search the passenger compartment of the vehicle and examine the contents of closed containers. See Commonwealth v. Bongarzone, 380 Mass. 326, 351 (1983). The Commonwealth must first demonstrate that (1) there was a lawful arrest, Commonwealth v. Santiago, 410 Mass. 737, 743 (1991); (2) the search was made contemporaneous with the defendant’s arrest, Commonwealth v. Alvarado, 420 Mass. 542, 554 (1995); and (3) the purpose of the search is limited to “fruits, contraband, and other evidence of the crime for which the arrest has been made.” G.L.c. 276, §1.
As previously discussed, the police had probable cause to arrest the defendant; therefore, the arrest was lawful. Second, Rivet searched the defendant’s vehicle at the time of the stop and therefore it was contemporaneous with the arrest. Lastly, Officer Rivet confined his search to the plastic bag, the item that the police suspected contained drugs. Even though the defendant was arrested while just outside his motor vehicle, Officer Rivet was authorized to search the entire passenger compartment. See Bongarzone, 380 Mass, at 351. For these reasons, the search of defendant’s car was legal.
3.Probable Cause to Search the Defendant’s Car Based on the Odor of Cocaine
Detecting the odor of an illicit substance may provide probable cause to conduct a search without a warrant. Johnson v. U.S., 333. U.S. 10 (1948); United *619 States v. Gust, 405 F.3d 797 (9th Cir. 2005); Commonwealth v. Kitchings, 40 Mass.App.Ct. 591 (1996) (detecting an odor of burnt marijuana provided probable cause to search the defendant’s vehicle). No Massachusetts court has confronted the plain smell doctrine as it applies to cocaine.
A.Other Courts
Other courts, state and federal, have permitted experienced narcotics investigations to testify that cocaine has a distinct odor and that trained police officers can detect it, even when the cocaine is wrapped in more than one plastic bag.[3] In none of these cases, however, have courts required the government to demonstrate any special foundation to qualify the officer as an expert witness who is competent to express such an opinion, nor have they required the government to establish the scientific basis for the proposition that cocaine has a unique odor that the human senses can detect.
B.Synopsis of the Relevant Facts
Officer Rivet testified that cocaine comes from South America to the United States, and in Mexico adulterants are added which, among other things, may include lactose and baby powder. Some of the adulterants have distinct odors. He further testified that chemicals used by the original packagers in South America cause cocaine to give off the same odor, regardless of the method used to process it or the dilutants used to cut it. This odor is strong. Although he has been working fifteen years in drug investigations, this was only the third time in which he detected this “distinct” odor in this particular situation.
Trooper Masterson testified that “harsh chemicals” such as ether or ethanol extract cocaine from a coca leaf. The leaves are crushed and mixed into a paste. It is then processed which produces a white powder which is shipped to the United States in bricks. He also said that cocaine is often diluted with lidocaine, acetone and other white or off-white powder. Although he claims that different substances may affect cocaine’s characteristic odor, the odor of cocaine is fairly constant, regardless of the process. He also testified that pure cocaine has no odor but also that the better the quality (the more pure) the stronger the odor. Lastly, he testified that the distinctive odor is the product of harsh chemicals used to process it.
C.The Expert Testimony Offered by the Commonwealth Does Not Meet the Daubert/Lanigan Standard
To admit expert testimony, the expert witness must be (1) a person qualified by training and experience in the field, (2) the theoiy on which the expert witness relies or the principle on which the expert’s testimony is based must be scientifically or technically reliable, and (3) the expert’s opinion must be one that is within the scope of his or her expertise. See Commonwealth v. Lanigan, 419 Mass. 15 (1994); see also Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993); KumhoTire Co. v. Carmichael, 526 U.S. 137 (1999). Courts are not obliged to examine these questions and perform a so-called “gatekeeper” function in every instance in which a witness offers an expert opinion. Case of Canavan, 432 Mass. 304 (2000) (Greaney, J. concurring). The ultimate determination of an expert’s qualification, however, lies with the trial judge. Commonwealth v. Boyd, 367 Mass. 169, 182 (1975).
This court finds that State Trooper Masterson is an expert in narcotics and is competent to testify as to how cocaine is processed, packaged, stored and sold on the street. He is also well qualified to testify about how to identify a substance as cocaine from its appearance and the price of typical amounts of cocaine used for personal consumption. He is not, however, qualified testify as to cocaine’s distinct odor because the Commonwealth did not sufficiently establish that the scientific underpinnings that support the view that cocaine has a distinct odor that humans can detect. He testified, generally, as to how cocaine was produced, and admitted that he had no knowledge of the specific chemical reaction that results from processing cocaine. This was not enough to meet the Lanigan standard in this case.
Experts are only permitted to testify in areas within their qualification. See Lanigan, 419 Mass, at 20. Within the realm of all police-related matters, officers may or may not have the requisite qualifications to testify on a particular subject.[4] The cases in which police have been qualified to testify as experts, however, involves issues that do not require special scientific knowledge. Typically, their expertise is the product of common sense and experience, or technical knowledge associated with the performance of their law enforcement function.
To illustrate, in Commonwealth v. Sands, the Commonwealth attempted to offer the testimony of an officer who conducted a Horizontal Gaze Nystagmus (HGN) sobriety field test to prove that the defendant was drunk. 424 Mass. 184, 184 (1997). When administering the test, the suspect is told to follow an object to the peripherals of his sight, and if his eyeball twitches the officer is trained to associate that twitching, nsytagmus, with drunkenness. However, it is a sign of number of ailments. Id. at 186. The court held that
The mechanics of the HGN test contrast distinctly from those of ordinaiy sobriety tests. These tests measure a person’s sense of balance, coordination, and acuity of mind in understanding and following simple instructions. A lay juror understands that intoxication leads to diminished balance, coordination and mental acuity from common experience and knowledge. The testimony of the result of an HGN test relies on an underlying assumption that there is a strong correlation between intoxication *620 and nsytagmus. That underlying assumption is not within the common experience of jurors.
Id. at 188. Therefore, the officer could testify that the twitching occurred, but he was not competent to testify that the twitching indicated that the defendant was in fact drunk. See Id.
Similarly, detecting the scent of cocaine is distinct from detecting the scent of other drugs such as marijuana. This court takes judicial notice of the fact that cocaine, unlike marijuana, is not simply harvested; it is chemically processed from coca leaves. See United States v. Brigman, 350 F.3d 310, 313 (3rd Cir. 2003). The origin of the scent of marijuana is the plant itself, and nothing is done chemically to alter it. In this situation, a narcotics officer would be competent to testify about its distinctive odor based on his or her experience.[5] However, “coca leaves can be processed into a variety of usable forms using an array of different and oftentimes toxic chemicals.” United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy (Feb. 1995).[6] How these processes occur, and more importantly, how these processes affect cocaine’s odor and humans’ ability to detect it, are not generally understood or accepted. The Commonwealth did not support Masterson’s theoiy by offering peer-reviewed journals, or experiments.
Also, where nystagmus is an objectively verifiable phenomenon that any person could be trained to observe, detecting odor of chemical by-product of another chemical substance may or may not be something that a human is competent to do. The testimony of a scientific expert is distinguished from an expert who gains his expertise from experience. For example, in Commonwealth'v. Goodman, the court permitted the testimony of a fire reconstructionist over the objection of the defense that the Commonwealth failed to establish his scientific theoiy. In that case the expert traced the path of the fire to its source, and “in matters which depend so heavily on common sense observations, not on a hypothesis for explaining phenomena as in esoteric scientific theoiy, the judge can properly look to his own common sense, as well as the depth and the quality of the proffered expert’s education, training, and experience.” Commonwealth v. Goodman, 54 Mass.App.Ct. 385, 391 (2002). Like standing on one foot for a sobriety test, and like tracing the path of a fire to its source, these are types of tests or measurements that reasonable people can grasp without the need for scientific verification. Id.; Sands, 424 Mass, at 188. The multi-step process of making cocaine, and how that affects its odor is not so pedestrian. Thus, like in Sands, Rivet can testify that he smelled something, but without the Commonwealth laying the foundation, he could not testify that what he smelled was cocaine. See Commonwealth v. Thad T., 59 Mass.App.Ct. 497, 506 (2003).
In a case like this the Commonwealth needed to offer expert testimony to explain how the chemistiy of processing cocaine creates a unique, distinct odor regardless of what chemicals or extraction methods are used. The Commonwealth’s theory assumes that there is a strong correlation between the odor that Rivet smelled and the presence of cocaine. See Sands, 424 Mass. at 188. This assumption rests on an untested hypothesis. Id. For example, studies show that drug sniffing dogs do not actually detect cocaine itself, but detect its by-product, methyl benzoate. United States v. $30,670, 401 F.3d 448, 457 (7th Cir. 2005). The experts testified that not only does methyl benzoate evaporate rapidly, but also, dogs (and perhaps humans) “cannot smell cocaine at all because the [cocaine] acts has as an anesthetic that deadens the olfactoiy senses.” Id. This case law raises many questions concerning Masterson’s testimony. Although he knew how cocaine was processed, he admitted that he was ignorant of how cocaine gives off its alleged distinct odor. The Commonwealth failed to meet the Lanigan standard by demonstrating that Masterson’s theoiy was tested, generally accepted, subject to peer review, or published. See Lanigan, supra.
Trooper Masterson’s testimony also was contradic-toiy. He testified that pure cocaine has no odor.[7] He also testified that the more pure cocaine is, the stronger odor it will have. Additionally, it is reasonable to question that if pure cocaine has no odor but no matter what dilutant is used, whether it be baby powder or rat poison, cocaine would still have the same distinct odor.[8] The court does not credit this testimony. He also testified that although different substances may affect cocaine’s characteristic odor, the odor is still constant. The court questions the basis of that opinion as well.
The court also questions whether officer Rivet’s detected an odor of a substance, which is packaged in a zip-lock bag, inside two other opaque, plastic bags. The police testified that the time between the bag was placed in backseat of the car and the time that the officer detected the odor, only a few minutes had passed. Furthermore, officer Rivet was standing outside the car in the open air.[9] The court is not prepared to credit the teistimony that the odor could permeate through three bags and overwhelm the area of the car in a short amount of time such that Officer Rivet could detect its odor from the outside.
In the future, when officers are offered to testify that cocaine has a distinct odor, courts should require reliable scientific testimony as to whether cocaine has such an odor, and the bases for believing it can be detected by the human sense of smell. As the testimony stands, however, the court does not credit the basis on which this police officer determined that cocaine was present.
*621 ORDER
For the above reasons, the defendant’s motion to suppress is DENIED.

Compare Parapar, 404 Mass, at 322 (immediately after being arrested for cocaine trafficking the informant told the police where he obtained the cocaine); Commomvelath v. Cast, 401 Mass. 891 (1990) (an informant who claimed that he could arrange a large shipment of cocaine made a statement against his penal interest); Commonwealth v. Vynorious, 369 Mass. 17 (1975) (informant told police of his drug transactions); Commonwealth v. Muse, 45 Mass.App.Ct. 813, 815 (1998) (disclosing the identity a cocaine dealer after admitting to larceny is a statement against penal interest); with Commonwealth v. Melendez, 407 Mass. 52, 57 (1990) (no fear of prosecution existed because although the informant admitted to buying and using cocaine, the statement was unaccompanied by any physical evidence and the likelihood of prosecution was remote because the incriminating information was given over the phone); Commonwealth v. Nowells, 390 Mass. 621 (1983) (the informant merely stated that he entered the defendant’s apartment to “get turned on with cocaine” which does not indicate that he committed a crime).

The informant also said that the defendant’s name was “J." The police later discovered that the defendant’s first name was Junet.

In the following cases, the courts accepted the testimony of the officers without any critical analysis of the foundation for which they based their testimony that cocaine has a distinct smell. United State v. Gary, 999 F.2d 474 (10th Cir. 1993); United States v. Asseff Cantrerras, 1998 U.S. Dist. LEXIS 13076 (1988) (after smelling the distinctive odor of cocaine, the officer had probable cause to open the sack and seize its contents); United States v. Douglas, 854 D.Supp. 383 (D.Virg.Isl. 1994) (a forensic chemist testified that cocaine has a distinct odor); Barry v. State, 163 Ga.App. 705 (1982) (an agent with a degree in chemistry testified that cocaine has a distinct odor); State v. Downing, 2005 N.C.App. LEXIS 801 (the plain smell of cocaine by an officer is evidence to conclude that there is probable cause for a search); Gonzalez v. State, 2001 Tex.App. LEXIS 7519 (an officer testified that cocaine has a strong unique smell and detection of its odor was a factor in determining probable cause). In United States v. Miranda, however, the defense proffered expert testimony that cocaine is odorless, but the court rejected the expert’s opinion given the amount of cases that upheld the validity of warrant-less searches, which were based on an officer’s detection of cocaine by smell. 951 F.Sup. 368 (E.D.N.Y 1996).

There are a number of areas in which officers are qualified to testify as experts. Commonwealth v. Gollman, 436 Mass. Ill (2002) (narcotics investigator properly allowed to testify that an amount of cocaine found on the defendant was not consistent with personal use); Commonwealth v. Frangipane, 433 Mass. 527 (2001) (social worker was an expert and could testify to dlssocation and recovered memory of child abuse victims, but testimony regarding neurological and physical function of brain was beyond her qualifications); Commonwealth v. Miller, 435 Mass. 274 (2001) (officer permitted to testify to administration of the field sobriefy test); Commonwealth v. Johnson, 413 Mass. 598, 603 (1992) (narcotics officer permitted to testify that manner in which cocaine was packaged was consistent with intent to distribute); Commonwealth v. Pope, 19 Mass. App. 627 (1985) (police officer permitted to testify that paper with notations was a bookmaker’s gambling book).

Kitchings, 40 Mass.App.Ct. at 597; Commonwealth v. Skea, 18 Mass.App.Ct. 685, 690, n.8 (1984); Commonwealth v. Monterosso, 33 Mass.App.Ct. 765, 769 (1992).

This report can be found at www.ussc.gov/crack/exec.htm (last visited June 23, 2005).

This position is supported by other sources. See United Stales v. Cruz-Roman, 312 F.Sup.2d 1355 (W.D.Wash. 2004) (the court found that cocaine has no odor and what was smelled were solvents that have legitimate uses). Among many websites, one, entitled “Herb Data” which is compiled and edited by Ivor Hughes provides scientific information about processing cocaine and also concludes that cocaine has no odor. http://www.herbdatanz.com/Cocaine_Pic-ture_Monograph,htm In People v. Darby, the court accepted the expert’s testimony that pure cocaine was odorless, but did not find the testimony relevant because the issue was the odor of “street level” cocaine, which contains other substances, not pure cocaine. 263 A.D.2d 112 (N.Y.App.Div. 2000).

Nor did Trooper Masterson testify that officers actually detect an odor associated with cocaine, which has been testimony which courts have lended credence to. United States v. Palomino, 100 F.3d 446, 450 (6th Cir. 1998) (the court upheld a search of a vehicle that was based on the detection of an odor that is associated with “ether-based cocaine”); United States v. Ramos-Caraballo, 375 F.3d 797 (8th Cir. 2004) (an air freshener provided probable cause); United States v. $129,727, 129 F.3d 486 (9th Cir. 1997) (the nexus between fabric softener and drug trafficking is recognized to be of great probative value); Lopez, 777 F.2d 543 (officer detected the smell of ether); Douglas, 854 F.Sup. at 383 (an officer testified that her experience led her to associate a specific odor with cocaine); Crawford v. State, 769 S.W.2d 331 (Tex.Ct.App. 1989) (the police detected odors associated with drugs); cf. Cruz-Roman, 312F.Sup.2dat 1355 (the smell of acetone did not support probable cause for a warrantless search).

Cf. United States v. Lopez-Ochoa, 2004 U.S.App. LEXIS 22799, 2004 WL 2397770 (10th Cir. 2004) (the officer could detect a “very strong odor of cocaine" that was contained in a sealed zip-lock bag, in a grocery bag).