## COMMONWEALTH *vs.* JOSE M. ESCALERA.

Plymouth. December 8, 2011. - June 29, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Controlled Substances. Firearms. Constitutional Law,* Search and seizure, Confrontation of witnesses. *Search and Seizure,* Probable cause, Curtilage, Expectation of privacy. *Probable Cause. Evidence,* Certificate of drug analysis, Ballistician's certificate, Constructive possession. *Practice, Criminal,* Motion to suppress, Confrontation of witnesses.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence obtained via a warrant to search his apartment, where the affidavit supporting the application for the warrant established a sufficient nexus between the defendant's suspected drug dealing and his apartment, in that the affidavit set forth particularized information from which it could be inferred that the defendant was using his apartment as a base of operations for a drug delivery business, based on police observations and statements from a credible informant [641-646]; further, the judge did not err in concluding that a locked basement was within the apartment's curtilage and that police were therefore permitted to search the basement pursuant to the warrant, where the occupants of the apartment had exclusive use of and access to the locked basement during their tenancy [647-649].

At the trial of indictments charging the defendant with drug and firearms charges, the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant constructively possessed items found in a locked basement [649-650]; however, this court reversed the convictions on all charges except the unlawful possession of ammunition, set aside those verdicts, and remanded for a new trial, where the erroneous admission of certificates of drug and ballistics analysis without accompanying testimony from the analysts, in violation of the defendant's constitutional right to confront witnesses against him, was not harmless beyond a reasonable doubt [650].

INDICTMENTS found and returned in the Superior Court Department on July 29, 2005; September 2, 2005; and April 21, 2006, respectively.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III,* J., and the cases were tried before *Charles M. Grabau,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William T. Harrington* for the defendant.

*Christine M. Kiggen*, Assistant District Attorney, for the Commonwealth.

DUFFLY, J. Based on a confidential informant's tip and surveillance that included controlled drug purchases, Brockton police obtained a warrant to search the defendant's apartment. Officers found cocaine, cash, and a small digital scale in the apartment. They also searched the locked basement of the apartment building and found over thirty grams of heroin, two handguns, and loose ammunition. Following a jury trial in the Superior Court, the defendant was convicted of trafficking in heroin, G. L. c. 94C, § 32E (c); possession of cocaine with intent to distribute, G. L. c. 94C, § 32A (c); corresponding school zone violations, G. L. c. 94C, § 32J; unlawful possession of a firearm without a firearm identification (FID) card, G. L. c. 269, § 10 (h);[1] and unlawful possession of ammunition without an FID card, G. L. c. 269, § 10 (h). The defendant appealed from his convictions and from the denial of his motion to suppress, claiming that police did not show a nexus between his suspected drug dealing and his apartment sufficient to establish probable cause for the warrant to issue.

A divided panel of the Appeals Court determined that the defendant's motion to suppress was properly denied because a sufficient nexus between the suspected drug dealing and the defendant's apartment had been established, and because the defendant had no objectively reasonable expectation of privacy in the basement of the apartment building. However, based on its conclusion that the admission at trial of certificates of drug and ballistics analysis without the testimony of analysts who had performed the tests violated the defendant's confrontation right under the Sixth Amendment to the United States Constitution, the Appeals Court reversed all convictions except that of

---

[1]After the jury returned their verdicts, the defendant pleaded not guilty to indictments charging a second or subsequent firearm offense, G. L. c. 269, § 10 (a). The Commonwealth placed these charges on file with the defendant's consent.

unlawful possession of ammunition.[2] *Commonwealth* v. *Escalera*, 79 Mass. App. Ct. 262 (2011). We granted the defendant's application for further appellate review.

We conclude that the search warrant application established probable cause to believe that evidence of the defendant's drug dealing would be found in his apartment, and that the motion judge did not err in finding that the basement was within the curtilage of the defendant's apartment. However, we conclude that, because the admission in evidence of the certificates violated the defendant's confrontation right under the Sixth Amendment, the defendant is entitled to a new trial.

*Background.* On April 11, 2005, Detective Timothy Stanton of the Brockton police department obtained a warrant to search 449 North Main Street, apartment no. 2, in Brockton (apartment). In reviewing the sufficiency of the warrant application, our inquiry "begins and ends with the 'four corners of the affidavit' " that supported it. *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). Read in its entirety, *Commonwealth* v. *Pina*, 453 Mass. 438, 439 (2009), Stanton's affidavit sets forth the following information.

In late March, 2005, Stanton, an eleven-year veteran of the Brockton police department, with training and experience in narcotics investigations, had a conversation with a confidential informant who stated that "he knew of a dark skinned Hispanic male who was selling heroin" in varying amounts and prices in Brockton. The informant stated that the heroin dealer walked with a pronounced limp; that he could be reached at either of two telephone numbers that the informant provided to Stanton; and that the dealer would ask "how many" and then provide a location where he would meet a purchaser to exchange money for heroin. According to the informant, the dealer would arrive at the location either in a white Toyota sedan or a " 'sharp' looking" green Audi sedan with tinted windows and after-market wheels. The informant stated also that the dealer had described ownership of several firearms and rifles and that he had indicated

---

[2]The defendant argued before the Appeals Court that he was entitled to a new trial on the ammunition charge; he does not press that argument before us.

an interest in purchasing any weapons the informant could find for him.

The informant said he would be willing to make a controlled purchase of drugs from this dealer, the male whom the informant later identified as the defendant from a photograph in police records. Over the course of the next two weeks, Stanton arranged to have the informant conduct four controlled heroin purchases. On each occasion, the informant called one of the telephone numbers he had provided; a male asked, "What do you need?" and the informant requested a specific quantity of heroin (either "one" or "two"). After searching the informant to ensure that he was not concealing drugs, Stanton provided the cash for the purchases, in amounts ranging from forty to one hundred dollars.[3] Stanton, with other detectives, then followed the informant to the agreed-upon location.

On the day of the first controlled purchase, as on each of the three subsequent occasions, the defendant arrived at the designated location within several minutes of the informant's telephone call, driving either the green Audi sedan with customized wheels or a white Toyota; the informant got into the vehicle and took a short ride. Each time after leaving the vehicle, the informant met with Stanton and gave him what he had purchased. The informant said that he sat next to the defendant during the drive, and the defendant produced from his person one or two clear plastic bags containing a brown substance that he exchanged with the informant for cash. Field tests conducted on the brown substance after each sale produced positive results for heroin.

Other detectives involved in surveillance of the transactions followed the defendant's vehicle and reported to Stanton that, on each of the four dates, the defendant drove directly to 449 North Main Street (apartment building); he was observed leaving his vehicle and walking with a pronounced limp to the building, which he entered through a door located at the southeast corner. After the defendant returned from two of the controlled purchases, police reported that they did not see the defendant leave the building "into the normal hours of sleep," and an early morning check found the vehicle he had driven the preceding day parked as he had left it.

---

[3]Nothing in the affidavit suggests that the bills were marked.

Additional surveillance was conducted during the two-week period in which the controlled drug purchases took place.[4] On the day of the third controlled purchase, detectives conducting surveillance at the apartment building saw the defendant leave the parking area of the apartment building in the Toyota several minutes after the informant initiated a telephone call to purchase drugs; the defendant was "followed and observed approaching the meet location and proceeding directly to the [informant]." After the exchange, the defendant was observed returning directly to the apartment building.

Police also observed two other transactions conducted by the defendant in a manner similar to the controlled drug sales, and made additional observations regarding the defendant's actions after returning to the apartment building. On April 1, 2005, police saw the defendant leave the building through a rear door, get into the Audi with another Hispanic male, and drive "so as to ensure he was not being followed"; as a consequence, a "loose surveillance was conducted," and the defendant was next observed meeting with a male and female. The female left her motor vehicle and entered the Audi; after a brief ride, the female left the Audi, and the defendant and his unidentified companion drove directly back to the apartment building, parking next to the white Toyota. The companion entered the building, and the defendant walked directly to the Toyota, looked around before unlocking the car, and opened the vehicle's hood. The defendant looked around again and then either took something from the engine compartment of the Toyota or placed something in it before closing the hood. He repositioned the Toyota so that it was blocking the Audi, then entered the rear of the building. Three days later, the detectives observed the defendant leave from the rear of the building and get into the Audi. He was followed and observed meeting a female who got into his car, was taken for a short ride, and was dropped off. The defendant returned directly to the apartment building and unlocked the Toyota, which he entered briefly. He then walked directly to the rear of the building and entered.

---

[4]The affidavit does not indicate whether surveillance of the apartment building at 449 North Main Street (apartment building) was in place throughout the two-week period or only sporadically.

Stanton met with the owner of the apartment building on April 7, 2005. The owner identified the defendant, his girl friend Lori Collins, and a male relative of the defendant as the residents of the apartment. The owner informed Stanton that, other than the owner, the occupants of the apartment were the only people in the building who had access to the locked basement and a locked storage container located to the rear of the apartment building.[5]

Based on this information, a magistrate issued a warrant authorizing the search of the apartment, and any person present, for drugs and materials, products, equipment, books, records, and proceeds related to drug distribution.[6] The warrant was executed in the early morning hours of April 11; the defendant and Collins were found asleep in a bed in the first bedroom encountered on entering the apartment. During the search of the apartment, police found eight bags of cocaine hidden inside an air conditioning unit and seventy-eight dollars in cash in a coat in a second bedroom; $238 in cash, a shoulder holster, and two cellular telephones on a night stand in the defendant's bedroom; and a digital scale and assorted paperwork bearing the defendant's name in the kitchen. Police also searched the locked basement of the apartment building, where they found a white plastic bag containing a .357 caliber handgun in a holster, a loaded .45 caliber handgun, additional .45 caliber ammunition, and a firearm cleaning kit containing approximately thirty-four grams of heroin.

*Discussion.* 1. *Motion to suppress.* a. *Nexus.* The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights "require a magistrate to

---

[5]Stanton confirmed through utility records that Lori Collins, the defendant's girl friend, was listed as the resident and account holder for the apartment. Registry of motor vehicles records showed also that the Audi was registered to Collins. Stanton learned from Brockton police records that Collins had been arrested previously on charges related to heroin distribution.

[6]The warrant described the location to be searched as "449 North Main St. Apt. 2 Brockton MA. 02301, a green in color multi unit building of brick and wood construction containing individual apartments. The front of said building being marked with the number 449, at street level." The warrant also described the defendant as the occupant to be searched. Separate warrants issued for the Audi and Toyota; no contraband was recovered from either automobile.

determine that probable cause exists before issuing a search warrant." *Commonwealth* v. *Byfield,* 413 Mass. 426, 428 (1992). "Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence." *Commonwealth* v. *Cinelli,* 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Rather, an affidavit offered in support of a search warrant "must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises." *Commonwealth* v. *Donahue,* 430 Mass. 710, 712 (2000). See *Commonwealth* v. *Upton,* 394 Mass. 363, 370 (1985) ("Strong reason to suspect is not adequate").

The defendant relies on *Commonwealth* v. *Pina,* 453 Mass. 438 (2009) (*Pina*), to support his claim that the affidavit failed to establish a sufficient nexus between his suspected drug dealing and his apartment because it reflects that he was only once observed leaving the apartment building and then proceeding to a controlled drug sale. Additionally, the defendant suggests that "affirmative evidence" in the affidavit establishes that the defendant was storing drugs in the Toyota and not in his residence, and therefore that is the "only reasonable inference" that could be drawn. We disagree that *Pina* supports the defendant's claim that nexus was not established here.

The affidavit in *Pina* established that on a single occasion the defendant "was observed driving from his apartment to a location where he sold cocaine to the informant"; we determined that, without more, this was insufficient to support probable cause to search the defendant's residence. *Id.* at 442. We expressed in that case our agreement with the Appeals Court's reasoning in *Commonwealth* v. *Smith,* 57 Mass. App. Ct. 907, 908 (2003), quoting *Commonwealth* v. *Kaufman,* 381 Mass. 301, 304 (1980), that "[t]he 'fundamental flaw' in the affidavit before us is that it does not explain why there was probable cause to believe that drugs or related evidence would be found at [the defendant's home] other than it being the residence of the defendant. . . . The confidential source cited in the affidavit does not indicate any familiarity with the defendant's residence . . . nor does the source claim ever to have been inside [the home]. . . . 'Notably absent [was] reliable specific information from any quarter placing illegal drugs or drug transactions there in the past.' " (Citation omitted.)

We reached a similar conclusion in *Commonwealth* v. *Medina*, 453 Mass. 1011, 1011 (2009) (*Medina*), issued the same day as *Pina*, where we held that an affidavit which established only that the defendant drove from his apartment to a drug sale and thereafter returned directly to his apartment "lacks the requisite nexus between the items to be searched for (drugs and drug paraphernalia) and the place to be searched (the defendant's apartment) to constitute probable cause to search."

As our decisions in *Pina* and *Medina* recognize, special protections are extended to a person's home under both the Federal and State Constitutions. See, e.g., *Georgia* v. *Randolph*, 547 U.S. 103, 115 (2006); *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring) ("it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people"); *Commonwealth* v. *Blake*, 413 Mass. 823, 829 n.8 (1992). We therefore have rejected the claim that a magistrate may reasonably infer that drugs are being stored in a home based solely on the fact "that the defendant lives there," *Pina, supra* at 441, and have held that police must provide "particularized information based on police surveillance or otherwise, that would permit a reasonable inference that the defendant likely kept a supply of drugs" in the home. *Id*. at 442.

We have not defined the precise contours of what constitutes "particularized information" because each case presents its own facts and must be considered in light of a unique set of circumstances. No bright-line rule can establish whether there is a nexus between suspected drug dealing and a defendant's home. Police may rely on a variety of investigatory sources in making the necessary showing, including police surveillance and statements from credible informants. See, e.g., *Commonwealth* v. *O'Day*, 440 Mass. 296, 298 (2003). Observations by police of a suspect on multiple occasions leaving his residence and proceeding directly to a prearranged location to sell drugs can support a reasonable inference that the suspect is a drug dealer who stores drugs or packages drugs for resale in his residence. See, e.g., *Commonwealth* v. *Cruz*, 430 Mass. 838, 841 (2000) (defendant engaged in six controlled sales, all occurring in parking lot of his apartment building); *Commonwealth* v. *O'Day, supra* at

298-300 (defendant left from his residence on two occasions; police also observed numerous quick visits by individuals to defendant's residence, and informant stated that he had purchased drugs inside residence); *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. 210, 211-212 (2005) (defendant left from his apartment for two controlled sales; informant stated that defendant stored drugs in defendant's apartment).

A single observation of a suspect leaving his home for a drug deal may also support an inference that drugs will be found in the home where it is coupled with other information, such as statements from credible informants. See, e.g., *Commonwealth* v. *Young*, 77 Mass. App. Ct. 381, 383-384, 388 (2010) (single controlled purchase coupled with informant's statements that defendant "always" selected sale locations within walking distance of his apartment sufficient to establish nexus); *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 103-106 (2007) (in two controlled purchases, police observed defendant driving from and returning to residence only once; informant provided information that defendant was selling large quantities of drugs on steady basis, and usual mode of operation was to deliver drugs away from residence).[7] Cf. *Medina, supra*; *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 597-598, 600-601 (1991) (nexus not established where police observed defendant leaving residence for single controlled sale and no other information

---

[7]In *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 108 (2007), the Appeals Court also suggested that the magistrate could have inferred that the defendant brought illicit proceeds into his house after returning from the controlled sale. That there may be proceeds from drug transactions in a home does not alone support probable cause to search the home for drugs. Although probable cause sufficient to support a search of a suspected dealer's home for additional drugs will generally also support a search for records and cash proceeds, we are not persuaded that information regarding records and proceeds alone will provide a sufficient nexus to search a residence for drugs.

Nonetheless, "if the circumstances of the case are sufficiently developed in the affidavit and the description of other incriminating items is done with some circumspection, courts are likely to find probable cause also exists as to these other items." 2 W.R. LaFave, Search and Seizure § 3.7(d), at 434 (4th ed. 2004). "[W]here the evidence shows that the person at the place to be searched is a dealer, it is fair to assume that he will have on hand the equipment needed for repackaging in smaller amounts at the time he receives his supply, and thus the warrant may also permit a search for that equipment. On like information, it has also been held that there is probable cause as to drug records [and] cash proceeds . . . ." *Id.* at 434-435.

connected residence to drug activity). Contrast *Pina, supra* at 441-442. Where police do rely on a single observation of a suspected drug dealer leaving his residence and proceeding to the location of a drug sale, the suspect's location immediately prior to the sale is of greater significance to the nexus determination than are his activities after the sale. Before a sale, the drug dealer either is in possession of drugs, or must proceed to a location to obtain the drugs. The inference that drugs will be found in the house is less strong if based solely on police observations of a suspected dealer returning home after a sale. Nevertheless, "there need not be definite proof that the seller keeps his supply at his residence. . . . [I]t will suffice if there are some additional facts [that] would support the inference that the supply is probably located there." 2 W.R. LaFave, Search and Seizure § 3.7(d), at 420-421 (4th ed. 2004).

Here, probable cause to search the apartment was established by Stanton's affidavit, which sets forth particularized information from which it may be inferred that the defendant was using his apartment as a base of operations for a drug delivery business.[8] Stanton described the defendant's pattern, in each of the four

---

[8]As to the informant's initial contact with Stanton, the affidavit does not state whether the informant obtained information from others or personally purchased drugs from the dealer. The affidavit explicitly asserts personal knowledge only as to the statement made by the Hispanic male to the informant that he would buy guns from him. When the application for a search warrant relies on information received from an unnamed informant, such information must meet the two-pronged standard set forth in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). Specifically, "the Commonwealth must demonstrate some of the underlying circumstances from which (a) the informant gleaned his information (the 'basis of knowledge' test), and (b) the law enforcement officials could have concluded the informant was credible or reliable (the 'veracity' test)." *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990), quoting *Commonwealth* v. *Robinson*, 403 Mass. 163, 164-165 (1988).

"However, an informant's detailed tip, plus independent police corroboration of those details . . . can compensate for deficiencies in either or both prongs of the *Aguilar-Spinelli* standard, and thus satisfy the art. 14 [of the Massachusetts Declaration of Rights] probable cause requirement." *Id.* Here, the informant's descriptions of the defendant's physical appearance, his automobiles, and his method of operation were independently corroborated by police through surveillance and heroin purchases. See *Commonwealth* v. *Parapar*, 404 Mass. 319, 323 (1989). They also were sufficiently detailed so as to be "consistent with personal observation, not mere recitation of a casual

controlled purchases, of arriving at the prearranged location, taking the informant for a short drive during which the sale would occur, and then returning to the apartment building. Although police only once observed the defendant leave from the apartment building to meet the informant, they twice observed him engage in the same pattern of behavior with others, on different days. Based on these observations, it reasonably may be inferred that the defendant engaged in six drug transactions. Before three of these transactions, the defendant departed from his apartment and drove directly to the location where an apparent drug deal took place; he returned to the apartment building after all six. The affidavit also provided information that the defendant could deliver drugs in variable quantities on short notice, further supporting the inference that the defendant kept a supply of drugs in his home. See *Commonwealth* v. *Cruz,* 430 Mass. 838, 842 (2000) (defendant "was able to sell between one-sixteenth and one ounce of cocaine to a customer on demand without contacting his supplier, and most likely kept his supply at the apartment"). The information provided a substantial basis for concluding that drugs, as well as contraband related to an illegal drug distribution enterprise, would be found in the defendant's apartment.

We reject the defendant's argument that his use of or access to the Toyota during three of the observed transactions provided "affirmative evidence" that drugs were not being stored in his apartment. Cf. *Commonwealth* v. *Dillon,* 79 Mass. App. Ct. 290, 295 (2011) (informant's affirmative statement that defendant stored drugs in engine compartment of his car did not suggest drugs were stored in defendant's residence). A warrant application "need not establish to a certainty that the items to be seized will be found in the specified location, nor exclude any and all possibility that the items might be found elsewhere. The test is *probable* cause, not certainty." *Commonwealth* v. *Young,* 77 Mass. App. Ct. 381, 386 (2010), quoting *Commonwealth* v. *Harmon,* 63 Mass. App. Ct. 456, 461 (2005). That evidence of the defendant's drug sales might also have been found in the defendant's vehicle does not detract from the conclusion that there was probable cause to search the apartment.

rumor." *Commonwealth* v. *O'Day,* 440 Mass. 296, 301 (2003), quoting *Commonwealth* v. *Alfonso A.,* 438 Mass. 372, 374 (2003).

b. *Search of the basement.* The defendant next contends that, even if the warrant was valid, it did not authorize police to search the locked basement. The warrant listed only the apartment as the location to be searched.[9] The defendant argues that the basement was not within the apartment's curtilage, and, therefore, the search of the basement was beyond the scope of the warrant.

In his written findings of fact and rulings of law, the motion judge concluded that the basement was within the curtilage of the apartment. In support of this determination, the judge found that the "building owner informed Stanton that the locked cellar area's access . . . [was] limited to himself and to the residents of [the apartment]." We independently review the judge's application of law to the facts found, *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), and conclude that, on the limited record before the motion judge, there was no error.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *Commonwealth* v. *McCarthy,* 428 Mass. 871, 873 (1999), quoting *United States* v. *Dunn,* 480 U.S. 294, 300 (1987). Today, the curtilage concept arises more commonly in the context of the Fourth Amendment and defines both the area to which Fourth Amendment protections extend and the area where police may search pursuant to a warrant. *Commonwealth* v. *McCarthy, supra* at 873-874. A warrant that authorizes the search of a particular dwelling also authorizes the search of areas within the curtilage of that dwelling. *Id.* at 874. See J.A. Grasso, Jr., & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 8-3[b] (2011-2012).

The United States Supreme Court has set out four factors to be considered when deciding whether a particular area is within the curtilage of a given home: "(1) the proximity of the area to

---

[9]Although Stanton's affidavit described that the defendant had access to the locked basement, the warrant application itself did not identify the basement as a location he sought to search. The application identified as places to be searched only the defendant's apartment and the two automobiles; warrants ultimately issued listing only those locations. We note that this issue "could have been avoided altogether had the police included the [basement] in the application for the search warrant." *Commonwealth* v. *McCarthy,* 428 Mass. 871, 872 n.3 (1999). See *Commonwealth* v. *Fernandez,* 458 Mass. 137, 141 n.9 (2010).

the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observations by people passing by." *Commonwealth* v. *McCarthy*, *supra*, quoting *United States* v. *Dunn*, *supra* at 301. There is no " 'finely tuned formula' that demarcates the curtilage in a given case." *Commonwealth* v. *Fernandez*, 458 Mass. 137, 142 (2010). See *Commonwealth* v. *McCarthy*, *supra*. The concept of curtilage is applied narrowly to multiunit apartment buildings. Curtilage in an apartment building is "very limited," *Commonwealth* v. *McCarthy*, *supra* at 875; "a tenant's 'dwelling' cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control." *Commonwealth* v. *Thomas*, 358 Mass. 771, 775 (1971).

In the present case, there was no evidentiary hearing. The only documents before the judge were Stanton's affidavit, the warrant, and the warrant return; a police report was introduced by the defendant for the limited purpose of establishing the location of certain contraband when it was found. Stanton's affidavit averred that only the tenants in the apartment had access to the locked basement. Stanton noted that the building owner retained access to the basement, but there was no information regarding the nature or frequency of that access during the defendant's tenancy. Based on this information, the motion judge was entitled to conclude that the occupants of the apartment had exclusive use of and access to the locked basement during their tenancy, thus making it part of the curtilage of that apartment. See *Commonwealth* v. *Thomas*, *supra*. See also *Commonwealth* v. *Wallace*, 67 Mass. App. Ct. 901, 902 (2006) (attic, although separated from defendant's apartment, "had all the indicia of being part and parcel" of apartment, including private access and key).

Much of the defendant's argument to the contrary relies on evidence developed through testimony at trial, which we do not consider in reviewing the judge's ruling on the pretrial motion. See *Commonwealth* v. *Grandison*, 433 Mass. 135, 137 (2001). Thus, the motion judge did not err in concluding that the basement was within the curtilage of the defendant's apartment and

that police were therefore permitted to search the basement pursuant to the warrant.

2. *Motion for required findings.* The defendant argues that his motion for a required finding of not guilty should have been allowed because there was insufficient evidence to establish his constructive possession of the handguns, ammunition, and drugs found in the basement. "Proof of constructive possession requires the Commonwealth to show 'knowledge coupled with the ability and intention to exercise dominion and control.'" *Commonwealth* v. *Boria,* 440 Mass. 416, 418 (2003), quoting *Commonwealth* v. *Brzezinski,* 405 Mass. 401, 409 (1989). Proof of possession may be established by circumstantial evidence and the inferences to be drawn therefrom. See *Commonwealth* v. *Boria, supra.*

Viewed in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), the following evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant constructively possessed the items found in the basement. The defendant's brother, who also lived in the apartment, had a key to the locked basement, where tires for the Audi, which was registered to the defendant's girl friend, and tires that may have belonged to the Toyota were stored. The jury reasonably could have inferred from this evidence that the defendant had access to the locked basement, where he stored the tires. Additionally, two handguns, but only one holster, were found in the basement. A second holster found in the defendant's bedroom closet was sized to fit both handguns recovered from the basement. "Contraband found in proximity to a defendant's personal effects may provide a link between a defendant and the contraband, if other evidence shows that 'the defendant has a particular relationship' to that location within the apartment." *Commonwealth* v. *Boria, supra* at 420, quoting *Commonwealth* v. *Pratt,* 407 Mass. 647, 652 (1990).

When a detective returned to the apartment from the basement holding the white bag in which the handguns, ammunition, and heroin were found, the defendant spontaneously stated — without having been told that the bag contained incriminating evidence — that he should not be charged with its contents because the bag was not found in his apartment. The jury were

"entitled to infer from [the defendant's] utterances" that he possessed the contraband found in the basement. *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424, 426 (1985). See *Commonwealth* v. *Mott*, 2 Mass. App. Ct. 47, 53-54 (1974) ("Although the control exercised by the defendant over the area may not have been exclusive, there was other evidence in the case, including the defendant's utterances, from which the jury could have found that the defendant was in fact constructively in possession of the heroin").

3. *Certificates of drug and ballistics analysis.* The defendant contends that he is entitled to a new trial on all the charges except the unlawful possession of ammunition because the Commonwealth violated his confrontation right under the Sixth Amendment by introducing in evidence one certificate of ballistics analysis and two certificates of drug analysis without accompanying testimony from the analysts. See *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 310-311 (2009). The Commonwealth concedes that a new trial on these charges is warranted in the interest of justice. Our independent review of the record supports a conclusion that the admission of the certificates was not harmless beyond a reasonable doubt. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 368 (2010); *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010).

*Conclusion.* Based on the foregoing, the defendant's conviction of unlawful possession of ammunition is affirmed. The judgments on the remaining indictments are reversed, the verdicts are set aside, and the matter is remanded to the Superior Court for a new trial on those indictments.

*So ordered.*