NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1672                                          Appeals Court

COMMONWEALTH  vs.  SANTOS PEREZ.[1]

No. 15-P-1672.

Bristol.     September 8, 2016. - October 21, 2016.

Present:  Green, Wolohojian, & Massing, JJ.

Controlled Substances.  Constitutional Law, Search and seizure,
    Probable cause.  Search and Seizure, Probable cause,
    Warrant, Affidavit.  Practice, Criminal, Motion to
    suppress, Warrant, Affidavit.  Probable Cause.

Indictments found and returned in the Superior Court
Department on November 29, 2012.

A pretrial motion to suppress evidence was heard by Raymond
P. Veary, Jr., J.

An application for leave to prosecute an interlocutory
appeal was heard by Geraldine S. Hines, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.

Tara L. Blackman, Assistant District Attorney, for the
Commonwealth.
Alexandra H. Deal for the defendant.

_____

[1] Also known as Luis Reyes-Ayala.

MASSING, J.  The Commonwealth appeals from the allowance of the defendant's motion to suppress evidence seized from an apartment in the execution of a search warrant.  The motion judge determined that the affidavit supporting the search warrant application, which relied in part on information provided by a confidential informant, did not satisfy the probable cause standard under the Aguilar-Spinelli test.[2]  Reviewing the affidavit in its entirety, we conclude that the application did establish probable cause to search for heroin in the subject apartment.  Accordingly, we reverse the order allowing the motion to suppress.

Background.  The defendant was indicted on charges of trafficking in 200 grams or more of heroin, in violation of G. L. c. 94C, § 32E(c)(4), and of manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense heroin, G. L. c. 94C, § 32(a).  It appears[3] that New Bedford police officers discovered a substantial quantity of heroin when they executed the warrant permitting them to search "172 Hathaway Street, apartment 3

---

[2] See Aguilar v. Texas, 378 U.S. 108 (1964); Spinelli v. United States, 393 U.S. 410 (1969).  See also Commonwealth v. Upton, 394 Mass. 363, 374-377 (1985).

[3] The record on appeal does not reveal exactly what was seized from the apartment.  Based on the indictment charging trafficking in 200 grams or more of heroin, we can safely assume that the police seized a nontrivial quantity from the apartment.

east" for controlled substances, "to include specifically [h]eroin," as well as instrumentalities used in, records of, and proceeds from the sale of controlled substances.

The affidavit in support of the search warrant application, prepared by Lorenzo Gonzalez, III, a New Bedford police officer with four years of experience, assigned as a detective in a unit specializing in narcotics investigations, states that the New Bedford police began an investigation of the defendant when they received a confidential informant's tip that "a male by the name of Luis Reyes,[4] with a date of birth of September 30, 1969 . . . was selling heroin out . . . of the aforementioned address." The informant further stated that the defendant used the names Javier Rios, date of birth February 13, 1969, and Salvador Pimental.  Gonzalez located records for Luis Reyes and Javier Rios with the birth dates provided by the informant in the New Bedford police database, as well as an expired Massachusetts driver's license for Javier Rios, with the same date of birth, in the Massachusetts Registry of Motor Vehicles (RMV) database. Gonzalez compared the photographs associated with these records and determined that they all depicted the same person.[5]

---

[4] The affidavit refers throughout to "Luis Reyes."  The defendant admits that he used the name Luis Reyes as an alias.

[5] The affidavit does not say whether the informant was shown the photographs of the defendant.  The informant further stated that the defendant lived at the apartment with his son, Eric

During the week before Gonzalez applied for the search warrant, the informant told Gonzalez that the defendant "would be conducting a delivery of heroin from the residence of 172 Hathaway Street," and that he "would be operating a black Chevrolet Malibu bearing Rhode Island registration plates." The police conducted surveillance of the residence and observed the car described by the informant, which was registered to a rental company. A short time later, they observed the defendant and another man get into this car, drive to another residence in New Bedford, stop for a short time, then drive back "in the direction of 172 Hathaway Street."[6]

Within seventy-two hours of applying for the search warrant, the police supervised the informant in a controlled buy from the defendant. Gonzalez searched the informant and determined that the informant "was not in possession of any illegal currency or contraband." The police gave the informant an unspecified amount of money. Under surveillance, the informant traveled to a prearranged location where he met with

_____

Soto Cruz. Gonzalez verified that the utility bills for the apartment were in the name of Eric Soto Cruz. He obtained Cruz's driver's license photograph from the RMV database, and the informant "positively identified the male in the photograph as Eric Soto Cruz, who resides at 172 Hathaway Street, apartment three (3) east."

[6] Gonzalez wrote in the affidavit, "This affiant knows that this behavior is consistent with street level narcotics distribution."

the defendant. After the transaction, the officers followed the defendant to 172 Hathaway Street. Gonzalez, meanwhile, followed the informant to another location where the informant gave Gonzalez an unspecified amount of heroin purchased from the defendant.

On September 12, 2012, the informant told Gonzalez that the defendant "would be conducting a delivery of heroin at approximately 8:00 P.M." The police took up surveillance of 172 Hathaway Street and, at the designated hour, saw the defendant and another man "exit the residence and get into a silver vehicle," a Dodge Avenger with Rhode Island license plates. The defendant drove[7] the silver car to a Getty gasoline station on Mount Pleasant Street in New Bedford and parked on the side of the parking lot away from the gas pumps and mini-mart.

A short time later, a black Kia pulled into the gas station and parked beside the silver car. Detective Sergeant Mark Blouin, one of the surveillance officers, observed a hand-to-hand transaction between the driver of the Kia and "the occupants of the silver Dodge which occurred through the passenger side window." The officers followed both cars after

_____

[7] The affidavit does not specify which seats the two men assumed when they got into the car; however, the defendant was seated in the driver's seat when the car was stopped later. As the affidavit contains no information about anyone getting in or out of the silver car, we infer that the defendant was in the driver's seat the entire time.

they left the gas station. The officers stopped the Kia, which was driven by Edward Combs, and searched it. Inside they discovered "an amount of heroin which weighed approximately 11.9 grams." During police questioning, when asked whether he had gotten "'a good deal' from the male whom Combs had just met up with," Combs stated the he had just purchased "a full stick, or ten grams" of heroin for $700. The New Bedford officers, assisted by members of the State police, stopped the silver Dodge on Route 24, "just north of the on-ramp following exit 17A on Route 24 North." Three men occupied the car: the defendant, sitting in the driver's seat, a man in the front passenger's seat, and a man in the back seat. The police searched the men and found "multiple cellular phones and a large sum of monies." The defendant had $1,473 in cash: $973 loose in his pocket and $500 in his wallet. The front seat passenger had $714 in cash: $410 in his pocket and $304 in his wallet.

Fearing that word of the arrests would reach other residents of the apartment, who might destroy any drugs secreted there, New Bedford officers secured the premises while Gonzalez sought a search warrant. Based on the information recited above, a clerk-magistrate issued the warrant to search apartment 3 east of 172 Hathaway Street.

Discussion. Probable cause "nexus." "In reviewing the sufficiency of the warrant application, our inquiry begins and

ends with the four corners of the affidavit that supported it."
Commonwealth v. Escalera, 462 Mass. 636, 638 (2012) (quotation
omitted).  We must determine independently whether the affidavit
supporting the search warrant provides "a substantial basis for
concluding that any of the articles described in the warrant are
probably in the place to be searched."  Commonwealth v. Upton,
394 Mass. 363, 370 (1985).  "Strong reason to suspect is not
adequate."  Ibid.  "In dealing with probable cause, however, as
the very name implies, we deal with probabilities.  These are
not technical; they are the factual and practical considerations
of everyday life on which reasonable and prudent men, not legal
technicians, act."  Brinegar v. United States, 338 U.S. 160, 175
(1949).

The motion judge began and ended his review of the search
warrant application by applying the Aguilar-Spinelli test to the
information that the confidential informant provided.  We start
instead by reviewing the information obtained independently by
police investigation to determine whether the affidavit
established a "nexus" between the defendant's suspected drug
dealing and the target apartment.  See Commonwealth v. O'Day,
440 Mass. 296, 302 (2003); Escalera, 462 Mass. at 642-643;
Commonwealth v. Tapia, 463 Mass. 721, 725-726 (2012).

1.  Direct police observations.  The police made three
observations that connected the defendant to the apartment, two

involving confirmed drug transactions. The first time, the defendant and another man left the building and returned there after driving to another location in New Bedford.[8] Next, the police observed the defendant returning to the apartment after he participated in the controlled buy, although the affidavit does not establish that he started out from the apartment to conduct this transaction. See Escalera, 462 Mass. at 645 (with respect to presence of drugs at defendant's home, "the suspect's location immediately prior to the sale is of greater significance to the nexus determination than are his activities after the sale"). Finally, the police observed the defendant and another man leave the apartment immediately before the sale of ten grams of heroin to Combs for $700.

The police investigation, as described in the affidavit, provided no other information to tie the defendant to the apartment. The New Bedford police and RMV data bases did not connect the defendant to 172 Hathaway Street. The police did not observe him spend the night. Contrast Escalera, 462 Mass. at 639. Although the utility bills were in Cruz's name, only

---

[8] Although this trip corresponded to a heroin delivery predicted by the informant, and Gonzalez stated that he "knows that this behavior is consistent with street level narcotics distribution," he reported no details to support that conclusion. He did not observe any interaction, let alone any exchange, that resembled an illegal drug transaction. See Commonwealth v. Kennedy, 426 Mass. 703, 708-711 (1998). Thus, we attach little weight to Gonzalez's opinion.

the informant's word established that the defendant lived with Cruz and that Cruz was the defendant's son. Apart from one observation of the defendant leaving the apartment to sell heroin and one observation of him entering the apartment after a controlled buy, "the affidavit provides no details about the amount and quantity of drugs the defendant had sold in the past, or any other facts tending to demonstrate that the defendant sold drugs from his apartment or that he kept his supply of drugs there." Commonwealth v. Pina, 453 Mass. 438, 442 (2009).

However, we cannot and need not decide whether the affidavit demonstrated probable cause by counting the number of drug transactions the defendant originated from or concluded at the apartment. "No bright-line rule can establish whether there is a nexus between suspected drug dealing and a defendant's home." Escalera, 462 Mass. at 643. Indeed, "[a] single observation of a suspect leaving his home for a drug deal may . . . support an inference that drugs will be found in the home where it is coupled with other information, such as statements from credible informants." Id. at 644. Accordingly, we turn to the information provided by the informant to determine whether it can be relied upon to strengthen the inference of a nexus between the defendant's heroin trade and the apartment.

2. Informant's statement. The informant told Gonzalez that the defendant "was selling heroin out . . . of the

aforementioned address."  To assess the probative value of this statement, we turn to the Aguilar-Spinelli test.  "For statements of confidential informants to be used in the assessment of probable cause under art. 14, the Commonwealth must satisfy the Aguilar-Spinelli test."  Tapia, 463 Mass. at 729.  "[Article] 14 requires that the affidavit apprise the magistrate of some facts and circumstances showing both (1) the basis of the informant's knowledge, and (2) the credibility of the informant or the reliability of his information."  Commonwealth v. Blake, 413 Mass. 823, 826 (1992).  "[I]ndependent police corroboration can make up for deficiencies in either or both prongs of the Aguilar-Spinelli test[;] . . . however, . . . each element of the test must be separately considered and satisfied or supplemented in some way."  Upton, 394 Mass. at 376.

The affidavit satisfied the basis of knowledge test.  The informant provided detailed information about the defendant, including his aliases and the birth dates associated with each alias.  He gave a detailed description of a rental car that the defendant would be driving on one occasion.  "The level of detail the informant provided . . . was 'consistent with personal observation, not mere recitation of a casual rumor.'"  O'Day, 440 Mass. at 301, quoting from Commonwealth v.

Alfonso A., 438 Mass. 372, 374 (2003). See Commonwealth v. Cast, 407 Mass. 891, 897 (1990).

On the other hand, as the motion judge correctly noted, the affidavit gave none of the usual indicia of reliability to satisfy the veracity prong of Aguilar-Spinelli. The affidavit did not state that the informant had a track record of providing reliable information in past investigations. Compare Commonwealth v. Gonzalez, 90 Mass. App. Ct. 100, 104 (2016), citing Commonwealth v. Crawford, 410 Mass. 75, 79 (1991).

However, the informant was not anonymous. See Alfonso A., 438 Mass. at 375-376; Gonzalez, supra at 104-105. Moreover, substantial police corroboration of the information supplied in this investigation bolstered the informant's veracity. The detailed information that the informant provided regarding the defendant's aliases, associated birthdates, and the car he would be driving all were proven accurate by subsequent police investigation or surveillance. The informant accurately predicted each occasion that the defendant would leave the apartment, including the time of the final heroin sale leading to the defendant's arrest.

The police also properly supervised the informant in a controlled buy from the defendant. See Commonwealth v. Desper, 419 Mass. 163, 168 (1994) (discussing components of a properly conducted controlled buy). "Without question, a properly

monitored controlled purchase of illegal drugs provides sufficient corroborating evidence to overcome any shortfalls in meeting the constitutional reliability requirements imposed on confidential informants."  Commonwealth v. Figueroa, 74 Mass. App. Ct. 784, 787-788 (2009), rev'd on other grounds, 77 Mass. App. Ct. 1117 (2010).  Although the controlled buy did not occur in the apartment and thus did not supply a strong nexus to that location, it substantially corroborated the informant's veracity and his status as a person with detailed knowledge of the defendant's heroin dealings.  See Commonwealth v. Welch, 420 Mass. 646, 652-653 (1995); Commonwealth v. Cruz, 53 Mass. App. Ct. 24, 30 (2001).

We recognize that Gonzalez's affidavit was not a model of detail or clarity.  For example, the unexplained appearance of a third man in the silver Dodge is puzzling.[9]  However, "the affidavit should be read as a whole, not parsed, severed, and subjected to hypercritical analysis."  Blake, 413 Mass. at 827.  The minor omissions and discrepancies may well be explained by

---

[9] However, we do not agree with the motion judge that this detail "seriously undermined" the inferences supporting probable cause to be drawn from the sale of heroin to Combs.  Gonzalez "observed this vehicle travel directly from the residence at 172 Hathaway St. to the Getty gas station on Mount Pleasant Street" (emphasis supplied).  "[T]he fact that he did not stop anywhere en route indicates that he had the substance with him when he left the premises and did not obtain it elsewhere on the way."  Commonwealth v. Clagon, 465 Mass. 1004, 1006 (2013).

Gonzalez's haste in preparing the warrant application while his companion officers kept vigil over the premises.

The informant's reliability having been established, we may use the informant's assertion that the defendant "was selling heroin out . . . of" the Hathaway Street apartment to substantiate the required nexus between the apartment and articles of the drug trade.  While the case is a close one, we conclude that the affidavit's description of the defendant's activities observed by police officers, coupled with the information provided by a credible informant, was sufficient to establish probable cause for a warrant to search the apartment for drugs.  "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  Commonwealth v. Germain, 396 Mass. 413, 418 (1985), quoting from United States v. Ventresca, 380 U.S. 102, 108-109 (1965).

Conclusion.  The order allowing the motion to suppress is reversed.

So ordered.